

Jenny H. Wang CA Bar No. 191643
jenny.wang@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:  714-800-7900
Facsimile:   714-754-1298

Attorneys for Defendant
LINCOLN LIFE ASSURANCE COMPANY OF BOSTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI COLLIER<br><br>   Plaintiff,<br><br>  v.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON<br><br>   Defendant. | Case No. 8:20-cv-00839-JVS-KES<br><br>**DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF**<br><br>Complaint Filed: May 1, 2020<br>District Judge: Hon. James V. Selna<br>Magistrate Judge:Hon. Karen E. Scott<br>Trial Date:  February 22, 2021, 3:00 pm |

# TABLE OF CONTENTS

**Page**

I.    THE GROUP POLICY REQUIRES PLAINTIFF TO PROVE SHE MEETS THE DEFINITION OF DISABILITY...................................................4

II.   PLAINTIFF SUBMITS LTD CLAIM AND DOES NOT SUPPORT IT..........5

    A.   Plaintiff Stopped Working, But Focused On Supporting a Workers Compensation Claim Instead Of Her LTD claim. .....................5

        1.   Plaintiff Obtains Work Restrictions From Her Orthopedist And Only Follows Up When They Are Set To Expire. .................6

        2.   Four Months After Leaving Work, Plaintiff Hires New Doctors To Document Her Workers Compensation Claim, But A QME Casts Significant Doubt On That Claim. ...................7

        3.   Plaintiff Belatedly Submits A Claim—But Not Sufficient Proof—To Lincoln.......................................................................11

        4.   Plaintiff's Appeal and Lincoln's Determination to Uphold the Denial After an IME Confirmed that Plaintiff Had Full-Time Work Capacity.....................................................................13

III.  LINCOLN'S CLAIM DETERMINATION WAS CORRECT. .......................17

    A.   Based On The Record, The Court Will Determine Whether Plaintiff Proved Her Claim (She Did Not)................................................17

    B.   Plaintiff's Sparse Treatment Records Revealed Only Self-Reported Complaints Uncorroborated By Medical Evidence. ...............18

    C.   Plaintiff's Appeal Hinges On A Biased And Reaching FCE. ................20

    D.   Plaintiff Has A History Of Presenting Inconsistently At Exams............24

    E.   Even The Mild Restrictions From Plaintiff's Treating Physicians Are Overstated. .......................................................................................24

    F.   Statements From Plaintiff's Friends And Family Do Not Prove Disability. .............................................................................................25

    G.   Plaintiff Did Not Overcome The Medical Evidence With Her Own Self-Reports; Lincoln Correctly Determined That She Failed To Meet Her Burden. .............................................................................26

IV.   CONCLUSION. ............................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alvis v. AT&T Integrated Disability Serv. Ctr.*,
  2009 WL 1026030 (E.D. Cal. Apr. 15, 2009)
    aff'd, 377 F. App'x 673 (9th Cir. 2010)......................................................25

*Barnhart v. UNUM Life Ins. Co. of Am.*,
  179 F.3d 583 (8th Cir.1999) .......................................................................18

*Bradley v. Summit Inst. for Pulmonary Med. & Rehab.*,
  2005 WL 2219284 (W.D. La. Sept. 13, 2005) ...........................................23

*Childers v. United of Omaha Life Ins. Co.*,
  2013 WL 683498 (S.D. W. Va. Feb. 22, 2013)...........................................25

*Conkright v. Frommert*,
  559 U.S. 506 (2010) ....................................................................................18

*Fleming v. Unum Life Ins. Co. of Am.*,
  2018 WL 6133859 (C.D. Cal. Nov. 20, 2018) ............................................14

*Gorbacheva v. Abbott Labs. Ext. Disability Plan*,
  309 F. Supp. 3d 756 (N.D. Cal. 2018),
    aff'd, 794 F. App'x 590 (9th Cir. 2019)....................................................21

*Groch v. Dearborn Nat'l Life Ins. Co.*,
  2020 WL 6374619 (C.D. Cal. Oct. 29, 2020) .............................................13

*Heimeshoff v. Hartford Life & Accid. Ins. Co.*,
  571 U.S. 99 (2013) ................................................................................17, 18

*Hines v. First Unum Life Ins. Co.*,
  2016 WL 1246483 (S.D.N.Y. Mar. 23, 2016).............................................23

*Jackson v. Wilson, Sonsini, Goodrich & Rosati Long Term Disability Plan*,
  2010 U.S. Dist. LEXIS 88930 (N.D. Cal. 2010).....................................26, 27

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
  63 F. Supp. 2d 1145 (C.D. Cal. 1999),
    aff'd, 370 F.3d 869 (9th Cir. 2004) ..........................................................17

*Kushner v. Lehigh Cement Co.*,
  572 F. Supp. 2d 1182 (C.D. Cal. 2008)................................................18, 26

*Langlois v. Metro. Life Ins. Co.*,
  2012 U.S. Dist. LEXIS 72779,
    2012 WL 1910020 (N.D. Cal. May 24, 2012) ..........................................20

*Leipzig v. AIG Life Ins. Co.*,
  362 F.3d 406 (7th Cir .2004) ......................................................................25

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

*Maniatty v. UnumProvident Corp.*,
  218 F.Supp.2d 500 (S.D.N.Y.2002),
    aff'd, 62 Fed. Appx. 413 (2d Cir.2003), cert. denied, 540 U.S. 966,
      124 S.Ct. 431, 157 L.Ed.2d 310 (2003) ..................................................... 25, 26

*Muniz v. Amec Const. Mgmt., Inc.*,
  623 F.3d 1290 (9th Cir. 2010) ..................................................................... 17

*Ness v. Aetna Life Ins. Co.*,
  257 F. Supp. 3d 1280 (M.D. Fla. 2017) ....................................................... 22

*Opeta v. Nw. Airlines Pension Plan for Contract Emps.*,
  484 F.3d 1211 (9th Cir. 2007) ..................................................................... 17

*Ortega-Candelaria v. Johnson & Johnson*,
  755 F.3d 13 (1st Cir. 2014) ........................................................................ 22

*Ross v. Prudential Ins. Co. of Am.*,
  304 F. App'x 502 (9th Cir. 2008) ................................................................ 26

*Seleine v. Fluor Corp. Long-Term Disability Plan*,
  598 F. Supp. 2d 1090 (C.D. Cal. 2009)
    aff'd, 409 F. App'x 99 (9th Cir. 2010) .............................................. 18, 25, 26

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) .................................................................................... 18

*Walsh v. Long Term Disability Coverage for All Employees Located in
  the United States of DeVry, Inc.*,
  601 F. Supp. 2d 1035 (N.D. Ill. 2009) ......................................................... 23

*Withey v. Metropolitan Life Ins. Co.*,
  1994 WL 731584 (D. Colo. Mar. 7, 1994) ................................................... 25

**Federal Statutes**

29 U.S.C. § 1132(a)(1)(B) ....................................... 4, 6, 7, 9, 11, 12, 14, 15, 16

**Regulations**

29 C.F.R. §§ 2560.503-1(h)(2) ...................................................................... 17

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

This action involves Plaintiff Vicki Collier's ERISA-governed claim for long-term disability ("LTD") benefits under an LTD plan (the "Plan") sponsored by Plaintiff's former employer, Automobile Club of Southern California (or "AAA"). Lincoln correctly determined that Plaintiff failed to satisfy her burden of proving that she was totally disabled, as defined by the Plan, from her sedentary/light occupation as an insurance sales agent. Plaintiff claimed disability due to orthopedic complaints involving her shoulders and spine, but her medical records were devoid of any medical findings that would support any impairment from performing the duties of her occupation. To the contrary, her physical examinations were largely normal, and her imaging studies showed stable findings, including in her cervical spine and right shoulder following right rotator cuff surgery in July 2017. Understandably then, Plaintiff's own doctors eventually released her to return to work with common-sense restrictions. Plaintiff's ability to return to full-time work was confirmed by two board-certified physical medicine and rehabilitation doctors: Dr. Chhatre, who performed a records review and Dr. Vlachos, who physically examined Plaintiff and reviewed the entirety of the medical record. Both independent physicians concurred with Plaintiff's treating physicians that Plaintiff had full-time work capacity.

At the end of a full, fair and comprehensive administrative process, every physician determined Plaintiff could return to work. As such, Lincoln made the only determination possible based on the record as a whole. Her single claim for relief—for LTD benefits under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) —fails. The Court should enter judgment in Lincoln's favor.

## I.   THE GROUP POLICY REQUIRES PLAINTIFF TO PROVE SHE MEETS THE DEFINITION OF DISABILITY.

Lincoln issued group disability income policy number GF3-860-444185-01 (the "Group Policy") to AAA. (1217.)[1] The Group Policy contains a 12-month, own

___

[1] Throughout this brief, the numbers in parentheses refer to the bates stamp numbers on the Administrative Record that was filed with the Court on January 29, 2021 (Dkt. # 17-1 to 17-2).

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

occupation definition of "Disability":

> [D]uring the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way; and thereafter, the Covered Person is unable to perform with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engaged with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity.

(1225.) "'Substantial and Material Acts' means acts that are normally required for the performance of the Covered Person's Own Occupation and ***cannot be reasonably omitted or modified***." (1228 (emphasis added).)

The Group Policy requires Plaintiff to submit proof of disability on an ongoing basis in order to qualify for benefits, as demonstrated by the following provisions:

- "Written proof of loss must be furnished to the insurer." (1256.)
- "'Proof' means written proof covering the occurrence, the character and the extent of the loss for which the claim is made." (1231.)
- "When [Lincoln] ***receives Proof that a Covered Person is Disabled*** due to Injury or Sickness, [Lincoln] will pay the Covered Person a Monthly Benefit." (1239.)
- "***Subject to due written proof*** . . . Long Term Disability benefits will be paid Monthly." (1256.)

Plaintiff's Elimination Period was from May 15, 2018 (the first day she stopped working) to November 15, 2018 (the date her STD benefits ended). (1221.) To receive benefits, then, Plaintiff had to prove that she was continuously disabled during the entire Elimination Period, (continuously from May 15, 2018 to November 15, 2018) and beyond. As explained below, Plaintiff failed to submit the required proof because there was none.

## II.    PLAINTIFF SUBMITS LTD CLAIM AND DOES NOT SUPPORT IT.

### A.    Plaintiff Stopped Working, But Focused On Supporting a Workers Compensation Claim Instead Of Her LTD claim.

Plaintiff worked for AAA as an insurance sales agent, a sedentary to light duty occupation. (1155-57.) Plaintiff performed her occupation despite shoulder pain for

5

years before having right shoulder rotator cuff surgery on July 25, 2017, returning to work thereafter.  (956-57.) Despite a successful recovery, she stopped working on May 14, 2018, claiming work-related repetitive use injuries: shoulder, neck, arm and wrist pain with right-sided numbness, tingling and weakness. (989, 996-98.) Because she blamed her complaints on her work environment, she focused on establishing a workers compensation claim and did not even submit a LTD claim for nine months.

### 1.     Plaintiff Obtains Work Restrictions From Her Orthopedist And Only Follows Up When They Are Set To Expire.

On May 10, 2018—four days before she left work—Plaintiff visited her internal medicine physician, Dr. Patrick Anthony. (1126-27.) Given the proximity to her claimed date of disability, one would expect her to mention her disabling conditions. She did not. Rather, she complained only about ringing in ears and said nothing about orthopedic pain. (*Id.*)

On the day she left work, May 14, 2018, Plaintiff saw her orthopedist, Dr. Tun. (1118.) Her chief complaint was persistent pain in bilateral shoulders. (1118.) Dr. Tun's examination revealed that Plaintiff had no muscle atrophy and her shoulder joint had 90 degrees of forward flexion and adduction, as well as external rotation of 70 degrees and 20 degrees of internal rotation. (1119.) She told Dr. Tun that she "[w]ill be stopping her current job" and there is no indication that Dr. Tun initiated any conversation about Plaintiff leaving work. (1119.) Nevertheless, Dr. Tun dutifully completed a work status report indicating that Plaintiff should be placed on modified work activity for two months (through July 15) with restrictions of "No typing. No use of both shoulders and arms." (1125.) Dr. Tun did not recommend further treatment other than providing her with an anti-inflammatory as well as pain medication and telling her to follow up as needed. (1119.)

Plaintiff did not see Dr. Tun again until July 6, when her work activity restrictions were about to expire. (1113.) She had stopped pain medications and was doing physical therapy at Henry Mayo. (*Id.*) Dr. Tun administered cortisone

injections and, again, told Plaintiff to follow up as needed. (*Id.*) Although, Dr. Tun renewed the prescription for the anti-inflammatory, he did not prescribe any pain medication. (1113.) Finally, Dr. Tun extended the work restrictions for approximately a month and a half, reporting that Plaintiff could "return to work at full capacity on 9/1/18." (1117.)

Once again, Plaintiff did not follow up with Dr. Tun[2] until the work restrictions were about to expire. On August 27, 2018—four days before Dr. Tun had cleared her to return to work at full capacity—Plaintiff had a telephone appointment in which she asked Dr. Tun to extend her work restrictions. (1089.) Curiously, although she had supposedly not worked in months, she told Dr. Tun she was experiencing shoulder "pain with prolonged activity." (1089.) Dr. Tun ordered a diagnostic MRI of the right shoulder and—per Plaintiff's request—extended her work modifications, saying she could return to work at full capacity on November 1, 2018 (two weeks before her Elimination Period expired). Although Dr. Tun offered a surgical option, Plaintiff declined. (1089.) There is no indication that Plaintiff ever treated with Dr. Tun again.

### 2. <u>Four Months After Leaving Work, Plaintiff Hires New Doctors To Document Her Workers Compensation Claim, But A QME Casts Significant Doubt On That Claim.</u>

Instead of following through with Dr. Tun, on September 5, 2018 (four months after leaving work), Plaintiff established care with Dr. Haronian (orthopedic surgeon) with an eye toward supporting her workers compensation claim. (956-67.) Dr. Haronian opined "***she may return to the workplace***, but should not lift, push, or pull more than 10 pounds. She should not perform bending, twisting activities, or place

---

[2] Plaintiff did have a few other visits in the interim. She had a neurology consultation with Dr. Gharibshahi on July 20, 2018 to receive Botox for migraines that she reported experiencing as of March 2017 (never having reported that they affected her ability to work). (1105.) Plaintiff did not mention her orthopedic complaints, except to say she had experienced some "minor pain" and that her "shoulder and neck felt much relaxed." (1105.) Ten days later, she saw Dr. Bogdanich, an internist, for cough and vaginal irritation. (1098-99.) She said nothing about her orthopedic issues. (*Id.*) Plaintiff received no further treatment over the next month, but did receive a cosmetic Botox injection to her lips on August 22, 2018. (1093.)

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

the spine in unusual or awkward positions. She should not perform repetitive hand motions, pinching or grasping bilaterally." (965 (emphasis added).) On October 10, Dr. Haronian again documented ongoing complaints of radiating neck and back pain, he refilled pain medications, and stated, "Her current work restrictions will continue." (952-53.)

On October 11, 2018, Dr. Ripu Arora performed a Qualified Medical Examination ("QME") on Plaintiff in connection with her workers' compensation appeal. (410-22.) Dr. Arora had Plaintiff fill out a number of forms about her symptoms and activities. One of the forms asked Plaintiff to rate, on a scale of 0-10, how much her pain interferes with her "ability to write or type." (418.) Plaintiff initially circled zero, then crossed it out and circled 2-3, adding that the interference increased to 10 if she had to sit for a long time while working. (418.) When asked to rate how much her pain affected her ability to walk a block or lift 10 pounds, Plaintiff circled 1. (417.) On a different form, however, Plaintiff reported that she could only walk "with much difficulty" and declined to answer questions about her ability to lift various weights. (414.)

Plaintiff told Dr. Arora that her claim was for "pain in her neck, shoulder, and lower extremities, hemorrhoids — internal and external, headaches, forearm, elbows, and shoulder blade pain and upper back pain because of the lack of the ergonomic furniture provided to her at the work location." (411.) Under "present complaints," however, Dr. Arora did not record any information about claimed shoulder symptoms. (413.) Instead, Plaintiff reported lower back pain during a recent 3-4 hour car trip and 4-hour flight to Chicago (much longer than she reported being able to sit). (413.) She also described achiness and stabbing pain in her upper arms as well as in her lower back and lower extremities. (413.) Plaintiff did not report pain in her hands/wrists or from using her hands/wrists. (410-22.) Her migraines and hemorrhoids had resolved. (413.) Dr. Arora performed bilateral shoulder examinations, but did not remark on any abnormalities. (420.) Because Dr, Arora did

not have access to Plaintiff's medical records at that time, he was unable to make a determination as to whether her claimed injuries were work-related, whether her condition was permanent and stationary, or whether Plaintiff had any permanent impairment. (421.)

On October 24, 2018, Dr. Arora reported, "Now I have received her medical records [from 2002 to 2018] and there are a lot of differences between her history provided to me at the time of the October 11th examination and the medical records provided to me." (378-79) For example, Dr. Arora reported that Plaintiff told him she injured her neck and left shoulder in 2016 in Mexico, but her medical records showed that she first complained of shoulder pain on March 27, 2015 to her internist and that she complained of neck pain long before her 2016 Mexico trip, going back to 2007. (379) Dr. Arora opined that Plaintiff's back and neck pain were not employment-related but that her right shoulder pain was related to employment. (380.) Plaintiff's right shoulder had been permanent and stationary since October 31, 2017, well before leaving work for this claim (indicating that it did not prevent her from performing her occupation). (*Id.*) Similarly, Plaintiff's neck and low back complaints pre-existed her employment and were thus not work-related (again, demonstrating she was able to perform her occupation with those complaints). Dr. Arora stated that Plaintiff should avoid any heavy lifting more than 20 lbs. and avoid reaching above head. (381) Dr. Arora did not give any further restrictions or limitations, including any relating to sitting tolerance or hand usage. Regarding future treatment, he stated that Plaintiff might need physical therapy for her shoulder for the next 12 months. (*Id.*) According to Dr. Arora, Plaintiff had a 9 percent whole person impairment, 4 percent of which was attributable to shoulder complaints. (407-08.)

Despite having established a primary care relationship with Dr. Haronian, Plaintiff had two appointments back at Kaiser on October 16, 2018 (for Botox injections) and November 12, 2018 (supposed to be a post-op visit for shoulder surgery that Plaintiff canceled due to being out of state for family issues). (1068-70.)

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

At both visits, Plaintiff admitted exercising for 6 hours per week "at a moderate to strenuous level." (1070, 1080.)

Plaintiff next saw Dr. Haronian (who did not yet have the QME report to go over MRIs of her cervical spine and right shoulder) on November 14. (588) Dr. Haronian did not update his work restrictions, meaning that he still felt Plaintiff could return to work with slight modifications. (588) On November 29, 2018, Dr. Haronian signed a "Primary Physician Progress Report" indicating that Norco, a pain medication, had reduced Plaintiff's pain by at least 30-40%. (591) Plaintiff "note[d] improved functional capacity with activities of daily living, self-grooming, and chores around the house. There are no significant adverse side effects" (592) Dr. Haronian did not amend his prior work restrictions. (592)

In November 2018, Dr. Haronian also referred Plaintiff to his pain management colleague, Dr. Jonathan Kohan. (946) Dr. Kohan saw Plaintiff for the first time on December 13, 2018 and performed a physical examination, in which Plaintiff demonstrated normal range of motion in the cervical spine and shoulders, normal reflexes and normal motor strength in the upper extremities. (940-42.) Dr. Kohan did not provide any restrictions or limitations.

In a follow-up visit note dated January 28, 2019, Dr. Kohan stated that he reviewed Dr. Arora's QME and acknowledged the many inconsistencies between Plaintiff's reported complaints and what Dr. Arora saw in her records. (929) However, Dr. Kohan disagreed that Plaintiff's neck, shoulder, and low back complaints were not work-related. (930) Dr. Kohan did not impose restrictions and limitations or critique Dr. Arora's mild restrictions. (929-30.)

Dr. Haronian saw Plaintiff again on January 31, 2019 and issued another report to bolster Plaintiff's workers compensation claim, entitled "Permanent and Stationary Report of a Primary Treating Physician." (917) He concluded that Plaintiff's injuries to her cervical and lumbar spine, shoulders, elbows and wrists were work-related and that Plaintiff had reached permanent and stationary status. (924-25) He identified the

following "work restrictions": no extended upward or downward gazing; no repetitive bending and twisting of the lumbar spine; no repetitive activities at or above the shoulder level; no repetitive torqueing; no repetitive power gripping, repetitive keying, repetitive grasping or repetitive pinching. (924.) Importantly, Dr. Haronian concluded, "The patient **can return to work** with the restrictions that have been provided." (924) (Emphasis added.)

### 3.    Plaintiff Belatedly Submits A Claim—But Not Sufficient Proof—To Lincoln.

Apparently satisfied with the workup of her workers compensation claim, Plaintiff turned her efforts to the LTD claim, submitting it in February 2019, nine months after she stopped working. (10.) Lincoln assigned Cara Campbell, Disability Case Manager, to initially handle the claim. Within a couple days, on February 19, Ms. Campbell called and spoke with Plaintiff about her claim. (10.)  Plaintiff informed Ms. Campbell that she had a desk job with AAA that did not include travel. She stopped working due to shoulder pain and had right shoulder rotator cuff surgery on July 25, 2017. (*Id.*) She returned to work after the surgery but stopped working in May 2018, purportedly due to continued pain in the right and now the left shoulder. (*Id.*) Plaintiff's workers' compensation claim was on appeal following denial. She stated that she was treating with Dr. Haronian, and also with physicians at Kaiser. (*Id.*) Plaintiff conceded that Dr. Haronian's restrictions of not to reaching overhead or lifting above a certain weight did not impact her occupation. (*Id.*) Rather, she claimed pain with repetitive motion (which is inconsistent with the forms she filled out for Dr. Arora in which she made it clear that sitting was the primary cause of her pain). (*Id.*; 417-18.)

Dr. Kohan saw Plaintiff for a follow-up visit on February 25, 2019 for medication management. (911) He noted that she did not report any side effects from her pain medications and that "For now, her complaints are under control with the current regimen with no interference." (912)

Lincoln obtained Plaintiff's medical records, as summarized above. Kristie Larocca, Disability Case Manager, then took over the handling of this claim in late February 2019. (9.) Ms. Larocca obtained an Occupational Analysis from Jane G. Howard, Senior Vocational Rehabilitation Consultant, who opined that Plaintiff's occupation was performed at sedentary to light physical demand categories in the national economy. (1155-57.)

On March 5, 2019, Plaintiff informed Ms. Larocca that Dr. Haronian was the physician keeping her out of work. (8.) Synapse, however, the clinic at which Drs. Haronian and Kohan practice, had not yet provided information to Lincoln. Ms. Larocca informed Plaintiff that "it [was] important to obtain those records." (8.) Ms. Larocca then spent the remainder of March and much of April 2019 attempting to obtain the Synapse records only to be told by Plaintiff that Synapse required a subpoena. (6-8.) Plaintiff finally obtained and mailed the Synapse records to Lincoln in late April.

Upon receiving the Synapse records, Ms. Larocca referred all of Plaintiff's medical records[3] to a third party, NMR, for a review. NMR chose Akhil Chhatre, M.D. (physical medicine and rehabilitation), who provided a report dated May 8, 2019. (900) Dr. Chhatre observed that Plaintiff's medical records, including MRIs of the cervical spine and right shoulder, showed stable exam findings with no new diagnostic testing or exam changes to suggest an acute neurologic or musculoskeletal derangement. (903.)  The severity and scope of Plaintiff's reported pain were not in line with her stable cervical, lumbar and shoulder conditions. (*Id.*) To get a better understanding of the treating physicians' opinions, Dr. Chhatre called and left four messages asking for a call back from Drs. Haronian and Kohan, and they did not return his calls. (901.) After a thorough review, Dr. Chhatre opined that Plaintiff could work full-time (8 hours/day, 5 days/week) without restrictions. (903.)

Faced with a file in which (1) a board-certified physician found no restrictions

---

[3] At that time, Lincoln did not yet have Dr. Arora's reports.

or limitations; (2) no treating physicians had responded to the reviewing physician; (3) no treating physician had articulated restrictions or limitations that were consistent with the records; and (4) treating physician records stating Plaintiff could return to work with mild restrictions, Ms. Larocca had no alternative but to recommend that Lincoln deny the claim. (6.) After agreement from her supervisor, Brian Cram, Ms. Larocca sent a letter dated May 9, 2019, informing Plaintiff that she failed to provide written proof that she was disabled, as required by the Group Policy and advising her of her appeal rights. (894-98.)

### 4. Plaintiff's Appeal and Lincoln's Determination to Uphold the Denial After an IME Confirmed that Plaintiff Had Full-Time Work Capacity

In July 2019, Plaintiff retained counsel, Glenn Kantor, who notified Lincoln of Plaintiff's intent to appeal the claim determination. (872.) Then, in October 2019, Mr. Kantor submitted additional information, including updated medical records. (850-55.) None of the new medical records spoke to treatment during the critical Elimination Period (May through November 2018).

Mr. Kantor included advocacy statements from Plaintiff's domestic partner, her daughter and Plaintiff. Mr. Kantor included a statement by Dr. Haronian signed on October 1, 2019, responding to Dr. Chhatre's report. (331) Dr. Haronian stated that based on his range of motion measurements and Plaintiff's reported back and neck pain, he believed Plaintiff "will not be able to perform her previous work activities as indicated in my January 31, 2019 report". (330)

To support the appeal, Mr. Kantor also retained Sebastian Jurado to perform a functional capacity examination ("FCE"). (707) To support the appeal, Mr. Kantor predictably hand-picked Sebastian Jurado to perform a functional capacity examination ("FCE").[4] (707) Mr. Jurado saw Plaintiff on September 12 and 13, 2019

---

[4] Mr. Kantor appears to have a history of hiring Mr. Jurado to support his clients' appeals. Mr. Jurado appears in two recent decisions as having provide an FCE report in connection with an appeal that Mr. Kantor handled. *Groch v. Dearborn Nat'l Life*

and had her perform various physical activities to her self-reported capacity. In other words, Plaintiff stopped each activity when she told Mr. Jurado she could do no more and said she had increased pain. Mr. Jurado stated that these test results demonstrated less capacity on day 2 as compared to day 1 of testing. (709.) As a result, he opined that Plaintiff was unable to perform sustained full or part-time work.  (708.) His conclusions are starkly at odds with Plaintiff's own treating physicians, who said she could go back to work with mild restrictions (*see* above).

Lincoln assigned Kimberly Murray, Appeals Consultant, to handle Plaintiff's appeal. (4.) Ms. Murray referred the file to a third party, ECN, for an Independent Medical Examination. ECN chose Stuart Rubin, M.D. (physical medicine and rehabilitation) in Los Angeles and scheduled the IME for December 20, 2019. (321.) The IME was delayed, however, because Plaintiff's counsel asked Ms. Murray to reschedule, claiming Plaintiff was unavailable on that date. (319.) Counsel also requested an examiner closer to Valencia, California. (*Id.*) Ms. Murray accommodated counsel's request and contacted another vendor, NMR, to select another IME physician. (315.) NMR chose Katrina M. Vlachos, M.D. (physical medicine and rehabilitation).  (*Id.*)

Dr. Vlachos examined Plaintiff on January 27, 2020. (296) Dr. Vlachos concluded that Plaintiff's reported pain was out of proportion to what was expected, based on her examination, her review of Plaintiff's records, including cervical, shoulder and lumbar MRI's, and 20 years of examining patients in an orthopedic nonsurgical specialty. (309-10.) Dr. Vlachos noted that Plaintiff complained of the same or worsening work-related repetitive use symptoms despite not having worked for almost two years. (309.) Dr. Vlachos noted that Plaintiff had good range of motion in the cervical/lumbar spine, as well as intact strength and minimal loss of sensation in the upper and lower extremities. (309-10.) She noted that Plaintiff was

*Ins. Co.*, 2020 WL 6374619, at *7 (C.D. Cal. Oct. 29, 2020); *Fleming v. Unum Life Ins. Co. of Am.*, 2018 WL 6133859, at *5 (C.D. Cal. Nov. 20, 2018).

working out and exercising on a daily basis. (*Id.*) Indeed, Plaintiff informed Dr. Vlachos that her activities included daily exercise, walking, stretching, taking classes at the gym and biking. (306.)  Biking is particularly inconsistent with Plaintiff's claims that she cannot use her hands and cannot remain in a seated position.

Dr. Vlachos also noted that Plaintiff had positive Waddell's signs which, when combined with the number of symptoms that were out of proportion to the imaging studies, led her to conclude "there are likely some nonorganic contributions to the claimant's symptoms." (309-10.) "Based on the claimant's examination and functional activities, the claimant appeared to be capable of more activity and she tends to underestimate her functional capabilities." (310.) Dr. Vlachos opined that with certain restrictions and limitations (e.g. taking a position break after sitting up to 30 minutes, changing positions after standing or walking up to 30 minutes, limiting fingering/typing to occasional), Plaintiff could work full-time consistently. Notably, Dr. Vlachos based her limitations not just on the exam and records review, but also "[took] into account [Plaintiff's] perceived limitations." (312.) Simple modifications like an ergonomic workstation, a sit-stand desk, and voice-activated software would permit Plaintiff to perform occupational duties within those restrictions. (311-12.)

Dr. Vlachos noted that these restrictions and limitations were "very similar" to those imposed by Plaintiff's own Dr. Haronian and the QME physician, Dr. Arora. Indeed, Dr. Tun had recommended an ergonomic workstation, apparently even before Plaintiff left work. (1119 (on 5/14/18 noting that Plaintiff was "still working on an ergonomic work station").) Even Plaintiff's own hired FCE provider, Mr. Jurado, concluded Plaintiff could sit for up to 3 hours per day, stand for up to 3 hours per day and walk up to 3 hours per day, which constituted 8 hours in a day. (313, 708.) Accordingly, Dr. Vlachos's opinions were based on comprehensive testing, accounted for Plaintiff's magnified subjective complaints, and were largely consistent with Plaintiff's own providers and hired expert.  Lending further weight to her opinion, Dr. Vlachos certified that she does "not accept compensation for review

activities that is dependent in any way on the specific outcome of the case." (313.)

Ms. Murray sent Dr. Vlachos's IME report to Plaintiff's counsel to for review and comments. (257.) Counsel did not comment, but instead submitted additional information, including additional records and reports by Drs. Haronian and Kohan. Though the reports contain a lengthy recitation of records Plaintiff never provided to Lincoln, neither Dr. Haronian nor Dr. Kohan addressed the IME or changed the restrictions/limitations they had previously provided. (78-220.) Plaintiff also provided advocacy statements from herself and her friend/personal trainer describing how they felt Plaintiff's functionality had declined over time. (61-75.)

Finally, counsel included an advocacy letter from Mr. Jurado dated February 21, 2020 reiterating his opinion that Plaintiff did not have full-time work capacity (despite him having given her over 8 hours of functionality per day), because on day 1 of the exam, Plaintiff sat for up to 30 minutes until deciding that she had to stand up due to pain, but only sat for 15 minutes before standing up, on day 2. (62-63.) Mr. Jurado did not address the fact that Dr. Vlachos observed Plaintiff sitting during her examination for 45 minutes without signs of pain. (*Id*.) Mr. Jurado argued that the FCE results demonstrated Plaintiff would have greater difficulty on days 3 and 4 of work "based on objective findings" – in reality, Plaintiff's self-reported capacity to sit, stand, reach, etc. (63)

Counsel also provided letters dated 2017 from several providers recommending that Plaintiff use ergonomically approved furniture and/or a standing desk. (238-40.) These statements do not support Plaintiff's claim. Rather, they reinforce Dr. Vlachos's statement that Plaintiff would be able to perform her occupational duties with a sit-stand desk and an ergonomic work station. (311-12.)

Ms. Murray reviewed the above information and wrote to Plaintiff's counsel on April 16, 2020 upholding the denial of Plaintiff's claim on appeal because Plaintiff failed to provide written proof that she was disabled for the entire elimination period (from May 15 to November 15, 2018), as required by the Group Policy. (12) Plaintiff

filed this action on May 1, 2020.

## III.   LINCOLN'S CLAIM DETERMINATION WAS CORRECT.

### A.   Based On The Record, The Court Will Determine Whether Plaintiff Proved Her Claim (She Did Not).

On *de novo* review, the Court considers the administrative record and determine whether Lincoln's decision–that Plaintiff failed to meet her burden of proving disability as defined by the Plan–was correct. *Opeta v. Nw. Airlines Pension Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) ("If *de novo* review applies, '[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.'").

The Group Policy required Plaintiff to furnish Lincoln with "written proof" of disability; specifically, "written proof covering the occurrence, the character and the extent of the loss." (1231.) Lincoln had a duty to the plan not to pay benefits unless and until Plaintiff furnished such proof continuously throughout the Elimination Period from May 15 to November 15, 2018. Lincoln had no burden to disprove Plaintiff's claim. *See Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1296 (9th Cir. 2010) (plaintiff bears the burden of proving entitlement to benefits); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1155 (C.D. Cal. 1999), aff'd, 370 F.3d 869 (9th Cir. 2004) (a claimant suing for benefits under ERISA bears the burden of proving his or her entitlement to plan benefits and "cannot shift the burden to the plan administrator to 'disprove' an alleged disability.").

In assessing whether Plaintiff met her burden, Lincoln had a contractual and regulatory duty to provide a "full and fair review" and to adhere to the terms of the plan including, importantly, strictly enforcing the Group Policy's "proof" requirements. 29 C.F.R. §§ 2560.503-1(h)(2); (b)(5)(requiring procedures designed to ensure compliance with governing plan documents); *Heimeshoff v. Hartford Life & Accid. Ins. Co.*, 571 U.S. 99, 108 (2013). This duty does not "favor payment over non-payment" but instead requires an "impartial account of the interests of all

beneficiaries." *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996). Because "the Plan is at the center of ERISA," Lincoln must strictly enforce the plan's proof requirements and pay only proven claims, per the plan terms. *Conkright v. Frommert*, 559 U.S. 506, 520 (2010) (administrators "have a duty to all beneficiaries to preserve limited plan assets . . . [and should] prevent . . . windfalls for particular employees"); *Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir.1999) (administrator "breaches its duty to all claimants as a fiduciary of the benefit funds when it grants claims to unqualified claimants").

In conducting a *de novo* review, the court has the same responsibility to strictly enforce the relevant plan provisions. *Heimeshoff*, 571 U.S. at 108. This is because enforcing plan terms as written is the "the linchpin of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Id.* at 108, *citing Varity*, 516 U.S. at 497. As applied here, Plaintiff could not obtain benefits unless she proved that she was continuously disabled from May 15, 2018 to November 15, 2018. She fell woefully short.

### B. Plaintiff's Sparse Treatment Records Revealed Only Self-Reported Complaints Uncorroborated By Medical Evidence.

Plaintiff first tried to meet her burden, essentially, by telling her doctors and Lincoln that she could no longer work. This is not adequate proof of disability. *See Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009) aff'd, 409 F. App'x 99 (9th Cir. 2010) ("numerous Courts have concluded that an administrator" may require "objective evidence of an inability to function in the workplace"); *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1191 (C.D. Cal. 2008) ("Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary.") But Plaintiff offered, quite literally, nothing else. The contemporaneous medical records Lincoln gathered did not provide any support for impairment from Plaintiff's sedentary to light occupation. Instead, they showed

18                                    Case No. 8:20-cv-00839-JVS-KES

very limited treatment for orthopedic complaints during the May 15 to November 15, 2018 elimination period and that treatment was aimed primarily at establishing a work-related injury:

- **5/14/18:** Office Visit Note ("OVN") by Dr. Tun. (1118) Chief complaint: persistent pain in bilateral shoulders (which she'd had for some time and been able to work). (1119) "Will be stopping her current job."

- **7/6/18** (when restrictions were about to expire): Consult with Dr. Tun regarding bilateral shoulder pain. (1112) Stopped pain medications. Does physical therapy. (1113) Shoulder injection given. (1116) .

- **8/27/18** (when restrictions were about to expire): Phone visit with Dr. Tun to extend work restrictions. Dr. Tun obliged, issuing a Work Status Report regarding modified activity at work and home from 9/1/18 through 10/31/18 with a return to full capacity work on 11/1/18 (two weeks short of the elimination period). (1091) Plaintiff never treated with him again.

- **9/5/18:** Initial orthopedic evaluation report by Dr. Haronian, apparently focused on supporting a workers compensation claim. (956) "In our opinion, she may return to the workplace, but should not lift, push, or pull more than 10 pounds. She should not perform bending, twisting activities, or place the spine in unusual or awkward positions. She should not perform repetitive hand motions, pinching or grasping bilaterally." (965)

- **10/10/18:** Follow-up Report by Dr. Haronian. (952) Her current work restrictions will continue. Awaiting authorization for further testing, receipt of complete prior medical records to make additional treatment recommendations.

- **10/11/18:** QME report by Dr. Arora before he received her medical records. (410) Diagnosis: cervical radiculopathy; right shoulder, status post rotator cuff repair, with pain; left shoulder pain; sacroiliac joint pain bilaterally and low back pain. He was unable to make any medical opinion as to causation, restrictions, or permanent and stationary due to lack of records.

- **10/24/18:** Supplemental report by Dr. Arora upon receipt of medical records. "[T]here are a lot of differences between her history provided to me at the time of the October 11th examination and the medical records provided to me." (378-79.) Plaintiff should "avoid any heavy lifting more than 20 lbs. and avoid reaching above head; follow-up with orthopedic surgeon. Regarding the future, she might need physical therapy for shoulder for next 12 months." (381.)

- **11/12/18:** Kaiser note indicating Plaintiff called to cancel right rotator cuff surgery "due to family issues out of state". (1069) No indication that this was ever rescheduled.

- **11/14/18:** Follow-up Report by Dr. Haronian. (949) Waiting for QME report. Until then recommending reasonable accommodations (described above) for full-time work.

Far from establishing disability, the contemporaneous medical records, show that Drs. Tun and Dr. Haronian both opined that she had full-time work capacity with

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

some slight and reasonable modifications, which is consistent with Dr. Vlachos's IME opinion. In addition, an unbiased and independent expert, Dr. Arora, examined Plaintiff in connection with her workers' compensation claim and noted inconsistencies between Plaintiff's self-reported complaints and the information in her medical records, as did peer reviewer Dr. Chhatre. Dr. Arora, like Drs. Tun, Haronian, and Chhatre, determined Plaintiff could work.

Lincoln, bound by its duty to only pay proven claims, had no choice but to conclude that Plaintiff failed to meet her burden of proving disability. Not one medical expert supported her claimed inability to return to full-time work for the full elimination period (through November 15, 2018). Lincoln would have violated its duties to the Plan if it approved benefits on such flimsy evidence.

### C.   Plaintiff's Appeal Hinges On A Biased And Reaching FCE.

On appeal, Plaintiff's attorney worked valiantly to support her claim. But his efforts fell short. Indeed, despite having a number of providers, Plaintiffs appeal relied primarily on a FCE performed by physical therapist who has a history of helping Plaintiff's counsel support claims. And that FCE gave Plaintiff considerably less work capacity than her own physicians, who—again—said Plaintiff could work full time with slight modifications.

Indeed, Mr. Jurado tried to manufacture "objective" support for his paying client, when in reality, there was nothing "objective" about the FCE. To the contrary, The FCE relied almost exclusively on Plaintiff's subjective efforts and her self-reported limitations about what she felt she could or could not do during the FCE. (*See, e.g.*, 709-11.) When evaluating functionality, it is not helpful to simply tell a claimant to sit until she thinks she needs to stand, and essentially allow the claimant to set the parameters of her own limitations. Such a "test", at most, can establish minimum abilities, not maximum ones. *See Langlois v. Metro. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 72779, 2012 WL 1910020, at *14 (N.D. Cal. May 24, 2012) (referring to the "inherently less reliable" nature of subjective reports).

FCEs are an oft-used tool for disability claimants to attempt to turn a claim based on self-reported limitations into a claim supported by objective evidence of impairment. FCEs are attractive to claimants because, unless the FCE contains robust validity testing, the claimant can completely dictate the results by deciding how much effort to put forth. *See, e.g., Gorbacheva v. Abbott Labs. Ext. Disability Plan*, 309 F. Supp. 3d 756, 771 (N.D. Cal. 2018), aff'd, 794 F. App'x 590 (9th Cir. 2019) (affirming administrator's decision to give FCE little weight on the basis that validity testing was insufficient to determine whether plaintiff was putting forth full effort).

The only method to identify when a claimant is exhibiting less than full and consistent effort is robust and differentiated validity controls embedded in the FCE. Here, Mr. Jurado references only a single validity test – grip strength testing, stating that valid results should differ less than 20% with successive test. (734.) In other words, Mr. Jurado performed 3 grip tests and Plaintiff's results (i.e. the amount of force her hands generated) were sufficiently consistent. The FCE report makes no other reference to validity of results. Mr. Jurado did opine that he felt Plaintiff expended maximum effort on day 1 of testing because her heart rate increased; however, that increase was notably absent on day 2. (709.) Mr. Jurado assumed it was because of higher self-reported pain, but does not even entertain the possibility that she was simply putting forth submaximal effort. (709.)

These meager measures do not demonstrate that Plaintiff exhibited maximal effort on the testing. At most, it demonstrates that Plaintiff's effort level was consistent (whether high or low), on the grip strength testing. For these reasons, courts routinely afford FCEs little weight when validity testing is not robust. *See, e.g., Gorbacheva*, 794 F. App'x at 771 (FCE entitled to little weight because validity testing was insufficient to determine whether plaintiff was putting forth full effort). Conversely, courts may afford FCEs more weight when it includes robust validity testing, such as when it includes "49 validity criteria," as opposed to the two measures Mr. Jurado applied (heartrate and grip strength consistency), one of which

she failed. *See, e.g., Ness v. Aetna Life Ins. Co.*, 257 F. Supp. 3d 1280, 1285 (M.D. Fla. 2017) (holding that FCE was entitled to weight when it included "49 validity criteria" including "multiple assessments of the degree of effort put forth by Ness" including assessment of "isometric and dynamic tests, hand tests and consistency of movement patterns."); *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 18 (1st Cir. 2014) (FCE entitled to little weight when "Ortega passed only three out of twenty-one 'validity criteria,' which are used to objectively determine whether a patient is honestly trying his or her best to complete the various physical tasks required for the evaluation.").

Even if Mr. Jurado's opinion regarding the FCE results deserved any weight (it does not), this was but a small snapshot of evidence in the context of the larger medical record, taken over two days, 16 months after the end of the Elimination Period. Mr. Jurado did not purport to review, let alone analyze, any of the contemporaneous medical records during the Elimination Period. Notably, none of Plaintiffs providers placed any restrictions on her ability to sit or stand during the Elimination Period. (965, 952-53, 1125, 1117, 1089.) Similarly, Mr. Jurado did not discuss Plaintiff's treating physicians' opinions that she could return to work. Nor did Mr. Jurado attempt to reconcile, or even address, Plaintiff's undisputed ability to sit for 45 minutes without any signs of distress during Dr. Vlachos's IME (when Plaintiff did not understand that she was being specifically tested on her ability to sit).

In contrast to Mr. Jurado's two-day snapshot, Dr. Vlachos comprehensively reviewed the entirety of the information available. (296-306.) Unlike Mr. Jurado, Dr. Vlachos reviewed and analyzed all of the contemporaneous medical records (including the FCE), she assessed the treating physicians' opinions, she conducted her own in-person interview and physical examination. (296-308.) At the end of this comprehensive process, Dr. Vlachos put all of the information together, including specifically accounting for Plaintiff's self-assessed subjective tolerances, and came up with reasonable restrictions and limitations that would allow Plaintiff to return to

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

work with some common sense accommodations. (308-13.) Unlike Mr. Jurado, Dr. Vlachos certified that she is independent and she does "not accept compensation for review activities that is dependent in any way on the specific outcome of the case." (313.) Not surprisingly, then, her report reads like an objective, comprehensive review of all the evidence. (296-313.)

Moreover, Dr. Vlachos's opinions were directly in line with the opinions of Plaintiff's own physicians, Drs. Tun and Haronian, who concluded that she could return to work with common-sense restrictions. *See, e.g., Bradley v. Summit Inst. for Pulmonary Med. & Rehab.*, 2005 WL 2219284, at *6 (W.D. La. Sept. 13, 2005) (upholding claim denial based in part on medical recommendation that plaintiff be provided with a special chair and voice-activated computer); *Hines v. First Unum Life Ins. Co.*, 2016 WL 1246483, at *12 (S.D.N.Y. Mar. 23, 2016) (denial upheld where three doctors opined claimant could do his job with ergonomic modifications); *Walsh v. Long Term Disability Coverage for All Employees Located in the United States of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1038 (N.D. Ill. 2009) (denial upheld because peer reviewer determined claimant could perform her occupation "with relatively minimal accommodations" such as an "ergonomic chair, and perhaps a sit-stand workstation"). They were also consistent with Dr. Arora's observations following his examination of Plaintiff, that her reported limitations contradicted what her medical records showed. Likewise, Dr. Chhatre opined that Plaintiff's reported pain complaints were inconsistent with stable findings on MRI's of the cervical spine and shoulder. (902-03.) As Dr. Vlachos pointed out, it made no sense that, despite demonstrating normal range of motion in the cervical spine and shoulders, normal reflexes and normal motor strength in the upper extremities, Plaintiff would continue to have the same or worsening pain from supposedly work-related repetitive use injuries after not having worked for two years. (310.) Again, Dr. Vlachos personally observed that Plaintiff was able to sit for 45 minutes during her examination without any signs of pain, in contrast to Plaintiff's presentation during Mr. Jurado's FCE.

### D.      Plaintiff Has A History Of Presenting Inconsistently At Exams.

Indeed, the administrative record contains a number of examinations the Plaintiff underwent during the claim. Those examinations reveal that Plaintiff's presentation and subjective limitations on range of motion testing varied wildly with no discernible pattern. Exhibit 1 is a compilation of Plaintiff's range of motion testing on her shoulders (the primary complaint when she submitted her claim). It shows, for instance, that Plaintiff's right should abduction varied from 92 to 134 degrees and her left should abduction varied even more: from 87 to 180 degrees. Similarly, external rotation on her right shoulder has been measured as low as 40 degrees and as high as 84 degrees. Internal rotation on her left shoulder varied from a low of 34 to a high of 90 degrees. And then she—inexplicably—had completely normal range of motion across-the-board with Dr. Kohan in December 2018. Nor is there any time-pattern to these inconsistent measurements (as would be expected if her condition was improving or worsening). The commonly heard "good day" vs. "bad day" explanation just does not explain away these vast inconsistencies.  She is simply all over the map when asked to demonstrate her range of motion, suggesting she is not a reliable historian of her own functionality. Because Dr. Haronian largely based his functionality opinion on range of motion examination, these erratic results render his opinions virtually meaningless.

### E.      Even The Mild Restrictions From Plaintiff's Treating Physicians Are Overstated.

Plaintiff was able to get Drs. Tun and Haronian to give her mild (and, in Dr. Tun's case, temporary) restrictions. But these treating physician statements cannot overcome the objective and unbiased opinions of Drs. Chhatre, Vlachos, and Arora—all of whom determined Plaintiff could work full time with no or very limited restrictions.

It is not surprising that Plaintiff's providers would heavily weigh her subjective beliefs about functionality. "Most of the time, physicians accept at face value what

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

patients tell them about their symptoms" *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir .2004). Such "acceptance [is] more or less required of treating physicians, but by no means required of the administrator." *Maniatty v. UnumProvident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y.2002), aff'd, 62 Fed. Appx. 413 (2d Cir.2003), cert. denied, 540 U.S. 966, 124 S.Ct. 431, 157 L.Ed.2d 310 (2003); *see also Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009) aff'd, 409 F. App'x 99 (9th Cir. 2010) ("Treating physicians are more or less required to accept the representations of their patients, but [the] ERISA administrator[] is not obligated to do so."); *Alvis v. AT&T Integrated Disability Serv. Ctr.*, No. 2:07-CV-00984, 2009 WL 1026030, at *17 (E.D. Cal. Apr. 15, 2009) aff'd, 377 F. App'x 673 (9th Cir. 2010) (rejecting subjective complaints recorded in medical records). This is particularly true as it appears Plaintiff hired Drs. Haronian and Kohan expressly for the purpose of supporting her workers compensation claim. They were thus intended to be advocates from the start of the physician-patient relationship. Despite their biased role, even they concluded Plaintiff could return to work with some restrictions.

> **F.**    **Statements From Plaintiff's Friends And Family Do Not Prove Disability.**

Instead of providing unbiased medical evidence, Plaintiff's counsel provided more subjective, advocacy statements from Plaintiff herself, as well as her friends and family. These self-serving submissions were worth little weight. *See, e.g., Childers v. United of Omaha Life Ins. Co.*, 2013 WL 683498 at *27 (S.D. W. Va. Feb. 22, 2013) (noting that letters of support attesting to a claimant's "good character" or describing "the author's observation of the deterioration of the [claimant's] condition" do not provide "the type of evidence required by [ERISA plans] to satisfy proof of loss"); *Withey v. Metropolitan Life Ins. Co.*, 1994 WL 731584 at *4 (D. Colo. Mar. 7, 1994) (to rely on "self-serving, uncorroborated testimonials of [claimant] and her several friends" would be "beyond the bounds of reasonable judgment").

### G.   Plaintiff Did Not Overcome The Medical Evidence With Her Own Self-Reports; Lincoln Correctly Determined That She Failed To Meet Her Burden.

At the end of the day, even the "proof" Plaintiff's counsel submitted on appeal, boiled down to Plaintiff's own self-reported (and easily-undermined) assertion that she could not return to work. Plaintiff's own say-so is not "proof" of disability. *See Seleine*, 598 F. Supp. 2d at 1101-02 ("LINA did not ignore Seleine's subjective complaints of pain. Rather, these complaints were subject to verification by objective medical evidence. LINA was under no obligation to accept them at face value. … The Court finds that the opinions of Seleine and her treating doctors are insufficient by themselves to establish disability under the Plan requirements and case law."); *Kushner*, 572 F. Supp. 2d at 1191 ("Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary."); *see also Ross v. Prudential Ins. Co. of Am.*, 304 F. App'x 502, 503 (9th Cir. 2008) ("Although the severity of pain may not be rejected because of a lack of objective verification, plan administrators are entitled to seek information on how the alleged impairment actually limited the claimant's functional capacity . . . [and] [t]he district court was correct to find that Ross's failure to provide such evidence undermined his claim."); *Maniatty v. UnumProvident Corp.*, 218 F. Supp. 2d 500, 503 (S.D.N.Y. 2002), aff'd, 62 Fed. App'x 413 (2d Cir. 2003) ("[t]he Group Policy requires "proof" and the "very concept of proof connotes some degree of objectivity."); *Jackson v. Wilson, Sonsini, Goodrich & Rosati Long Term Disability Plan*, 2010 U.S. Dist. LEXIS 88930, *14 (N.D. Cal. 2010) ("The objective medical evidence in the record, upon which Prudential based its denial of long term disability coverage and the Court affirms, fails to substantiate Plaintiff's self-reported symptoms). If a plaintiff's self-reports sufficed for proof, insurers would have to pay all claims and that is simply not the law.

But Plaintiff here offered nothing more. All of the other evidence in the file

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF

pointed in the opposite direction of disability. (*See* Sections B-E, above.) That evidence included stable imaging studies, the fact that Plaintiff's reportedly worsening, work-related repetitive use symptoms were entirely inconsistent with the fact that she had not worked for two years, her largely normal examination findings and her activities, which included regular and vigorous daily exercise. (*Id.*; 306.) Such evidence also included the opinions of Plaintiff's own treating physicians who found her capable of returning to work, not to mention Dr. Chhatre's opinions and those of Dr. Vlachos. Finally, Plaintiff's own wildly inconsistent findings at examinations (Ex. 1) along with her variant reports of functional impairment (can barely walk, but can bike regularly and exercise vigorously for an hour per day) demonstrate that she is not a reliable judge of her own functionality.

## IV.   **CONCLUSION.**

In sum, Lincoln reached the only conclusion supported by the medical evidence. Plaintiff's LTD claim was simply collateral to her workers compensation claim and it failed. At no point did any of her workers compensation providers say she could not work full time throughout the elimination period. She came nowhere close to providing the "proof" required by the Group Policy. The Court should enter judgment in Lincoln's favor, upholding its claim denial.

DATED: February 1, 2021                OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ Jenny H. Wang
Jenny H. Wang
Attorneys for Defendant
LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON

45731889.2

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPENING BRIEF