Zoya Yarnykh – State Bar No. 258062
 E-mail: zyarnykh@kantorlaw.net
Kantor & Kantor, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
Telephone: (510) 992-6130
Facsimile: (510) 280-7564

Glenn R. Kantor – State Bar No. 122643
 E-mail: gkantor@kantorlaw.net
Kantor & Kantor, LLP
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
Facsimile: (818) 350-6272

Attorneys for Plaintiff
VICKI COLLIER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| VICKI COLLIER,<br><br>Plaintiff,<br><br>vs.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON,<br><br>Defendant. | Case no.: 8:20-cv-00839-JVS-KES<br><br>**PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSION OF LAW** |

Pursuant to the Court's scheduling order [Doc. 16], Plaintiff, Vicki Collier, hereby respectfully submits the following [Proposed] Findings of Fact and Conclusions of Law.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., by Vicki Collier ("Plaintiff" or "Ms. Collier") against Defendant Lincoln Life Assurance Company of Boston ("Defendant" or "Lincoln"). The action involves a dispute over Ms. Collier's entitlement to receive Long Term Disability ("LTD") benefits under a welfare benefit plan sponsored by Automobile Club of Southern California ("AAA") and insured by Lincoln. The administrator of the LTD plan is also Lincoln.

The parties agree that the appropriate standard of review is de novo. The court agrees this is the appropriate standard in this case. Orzechowski v. The Boeing Co. Non-Union Long-Term Disability Plan, Plan Number 625, 856 f.3d 686, 695 (9th Cir. 2017).

Via two subparts, Lincoln lodged with the court a redacted Administrative Record ("LIB") that was bates-stamped LIB000001 through LIB01259. [Docket Nos. 17-1 and 17-2]. The parties also submitted opening trial briefs, responsive trial briefs, and proposed findings of fact and conclusions of law for review. A bench trial was held on February 22, 2021.

Plaintiff is asking the Court to find that she proved her entitlement to LTD benefits by a preponderance of the evidence and, thus, that Lincoln's denial of her LTD claim was in error. As relief she asks the Court to reinstate her LTD benefits with payment of back benefits and interest, to order the continuation of LTD benefits for so long as Plaintiff remains entitled to the benefits under the terms of the LTD Plan and allow her to make a motion for attorneys' fees and costs. [Complaint, Docket No. 1, Request for Relief]; 29 U.S.C. § 1132(a)(1)(b) & (g)(1). Defendant is asking that judgment be entered in its favor on Plaintiff's claims for relief.

For the following reasons, Plaintiff's request to overturn Lincoln's decision denying her LTD benefits is granted, Plaintiff is reinstated to the LTD Plan,

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

awarded her LTD benefits to date (and through the "any occupation" definition of disability), plus interest and, as the prevailing party, Plaintiff may bring a motion for attorneys' fees and costs as permitted under ERISA.

## I.   Findings of fact[1]

The Court has reviewed and considered all the documents submitted by the parties. Due to the large amount of information submitted, herein the Court will review facts sufficient to explain its determination.

## A.   Relevant LTD Plan Terms

1.      The LTD Plan defines disability in relevant part as:

**Disability** or **Disabled** means:

i. that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engage with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity.

LIB 1225.

2.      The LTD Plan defines "Substantial and Material Acts" as "acts that are normally required for the performance of the Covered Person's Own Occupation and cannot be reasonably omitted or modified." LIB 1228.

3.      The LTD Plan defines "Own Occupation" as "the Covered Person's

---

[1] Notwithstanding this format, any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

occupation that he was performing when his Disability or Partial Disability began." LIB 1229.

4.    The LTD Plan does not contain any language conferring discretionary authority to Lincoln to interpret the policy or the benefit plan, or to determine eligibility for benefits.

**B.    Ms. Collier's Insurance Agent Job with AAA**

5.    Ms. Collier is a 57-year-old woman who worked as an Insurance Agent for AA, was a participant in AAA's LTD benefit plan, and was insured by the policy. LIB 1217.

6.    Ms. Collier had worked for AAA since 2013. Her last day of work was May 14, 2018.

7.    Ms. Collier' job required selling insurance policies and memberships, quoting rates; qualifying applicants; inspecting vehicles or property; completing documentation with accepted underwriting criteria; developing sales leads and contacts; providing insurance policy service to members in person, by telephone or through written correspondence; collecting premiums; and compiling and completing documentation for all transactions. LIB 785-787.

8.    Ms. Collier's job required use of a computer for approximately 85% of the workday. LIB 787.

9.    Ms. Collier excelled in her work and received glowing performance reviews since she began her employment with AAA in 2013 (LIB 746-796). For example, her 90-day review in 2013 states: "Vicki has immediately proven to be an elite agent and great asset to the Santa Clarita sales team. Vicki is extremely motivated, hard-working, outgoing and sales-oriented which has led to her immediate success. Vicki's first two months of production exceeded the standards for auto and home production…" (LIB 751). She was also a top producer in 2016 for auto and home insurance sales (LIB 776). Her supervisor noted that she was

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

3

consistently the top producer in the office. Ms. Collier ranked 33 out of 557 agents (LIB 784).

10.    Ms. Collier ranked 33rd out of 557 agents (LIB 784).

**C.    Ms. Collier Stops Working Due to Multiple Medical Conditions**

11.    Ms. Collier has been diagnosed with cervical radiculopathy, lumbar radiculopathy, bilateral rotator cuff tear, bilateral shoulder impingement syndrome, migraines, bilateral elbow tendinitis, and bilateral wrist tendinitis (LIB 92, 529-530, 1056-1057, 1068, 1091).

12.    She had right shoulder surgery in July of 2017 and returned to work in November of 2017 (LIB 337, 1118-1120).

13.    Ms. Collier was prescribed Norco and gabapentin, received Botox injections to treat her migraines, and cortisone injections in both shoulders (LIB 1054-1059, 1113).

14.    Ms. Collier began treatment at Synapse Medical Group with Drs. Edwin Haronian and Jonathan Kohan in September 2018 in connection with an ongoing Workers' Compensation claim. Dr. Haronian declared Ms. Collier "permanent and stationary" on January 31, 2019 (LIB 523-533).

15.    Dr. Haronian issued the following restrictions:

- Cervical spine: the patient is precluded from extended upward and extended downward gazing;
- Lumbar spine: the patient is precluded from repetitive bending and twisting of the lumbar spine;
- Bilateral shoulders: the patient is precluded from repetitive activities at or above the shoulder level;
- Bilateral elbows: the patient is precluded from repetitive torqueing;
- Bilateral wrists: the patient is precluded from repetitive power gripping, repetitive keying, repetitive grasping, and repetitive

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

4

pinching; and

- Avoid lifting more than 10 pounds.

16. Since reaching the "permanent and stationary" status, Ms. Collier's symptoms of pain persisted. During a visit on May 16, 2019, examination continued to show spasm, tenderness and guarding in the paravertebral musculature of the cervical and lumbar spine. Bilateral shoulders had impingement and Hawkins signs, with range of motion in flexion and abduction to 120 degrees. The range of motion in a healthy shoulder is 180 degrees for abduction and flexion (LIB 526). Bilateral wrists had positive Phalen and reverse Phalen signs with decreased grip strength, distal radial tenderness, and decreased two-point discrimination over the hands (LIB 555-556).

17. During an office visit on September 5, 2019, Dr. Haronian documented Ms. Collier's complaint of chronic low back pain with radiation to left lower extremity and postoperative pain in the right shoulder, noting that the severity of the pain dominated virtually every conscious moment producing physical and psychological debilitations (LIB 99-100).

18. In addition to personally treating and evaluating Ms. Collier, Dr. Haronian reviewed extensive medical records pertaining to Plaintiff, which contain imaging studies and physical examinations which show consistent progression of Ms. Collier's disabling conditions, surgical interventions, and treatment with narcotics, steroid injections, and physical therapy (LIB 136-162; 167-209).

19. The cervical MRI dated October 5, 2016 performed at Kaiser revealed straightening of normal lordotic curvature, usually secondary to muscular spasm, a 1mm broad-based posterior disk bulge indenting the anterior aspect of the thecal sac at C3-C4, a 2mm central posterior disk protrusion causing pressure over the anterior aspect of the thecal sac at C4-C5, a 2mm broad-based posterior disk protrusion causing pressure over the anterior thecal sac at C6-C7, with mild narrowing of the left neural foramen and moderately significant narrowing of the

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

5

right neural foramen (LIB 502-504).

20.     A lumbar spine MRI dated February 15, 2019 showed anterior osteophytes at T12 through L5, mild disk desiccation at L2-L3 through L5-S1with associated loss of disk height at L5-S1, and a 2.6mm disk bulge abutting the thecal sac with central posterior annular fissure at L5-S1 (LIB 499-501).

21.     During an office visit with Dr. Haronian on December 11, 2019, Ms. Collier complained of residual pain, and Dr. Haronian opined that her condition has been unchanged since he declared her permanent and stationary in January of 2019. He stated that he will continue to see her periodically for medical care (LIB 214-215).

22.     Dr. Jonathan Kohan, Pain Management specialist, worked in tandem with Dr. Haronian and prescribed medications including Norco, Neurontin (gabapentin), and Cymbalta (LIB 95).

23.     Dr. Kohan opined that Ms. Collier reached permanent and stationary status on August 13, 2019. He stated that Ms. Collier has failed several rounds of treatment and physical therapy, and he did not believe that a spinal injection would not be beneficial (LIB 95-97).

24.     Dr. Kohan's physical examinations over the course of more than a year have consistently revealed tenderness to palpation over paravertebral, trapezius, deltoid, and rhomboids area with moderate spasm, tenderness over paraspinous muscles, tenderness and moderate-to-severe spasm over the cervical spine extending to trapezius and deltoid, weakness in flexion and extension of the right shoulder, and bilateral tenderness over the SI joints (LIB 596-605; 519-521; 538-539; 96-97).

25.     Ms. Collier is still treating with Drs. Haronian and Kohan, but her presentation has not changed (LIB 91-92, 214-215).

26.     In addition to Drs. Haronian and Kohan, Ms. Collier has been treated by various providers at Kaiser Permanente. She received multiple Botox injections

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

6

to treat her chronic migraines/headaches in 2018 and 2019 (LIB 1056-1057).

27.    She was also seen for her shoulder pain, diagnosed with right rotator cuff syndrome/tear, and prescribed Norco and Kenalog injections (LIB 1068-1071).

28.    Ms. Collier's surgeon, Dr. Sovarinth Tun, issued several work restrictions: May 14, 2018, July 6, 2018, and August 27, 2018—no typing and no use of both shoulders and arms (LIB 1091, 1117, 1115).

**D.    Lincoln Denies Ms. Collier's Claim for Benefits**

29.    Ms. Collier timely submitted her LTD claim for benefits, but Lincoln denied her claim on May 19, 2019 (LIB 894-899).

30.    Pursuant to the terms of the Plan, Ms. Collier is entitled to receive LTD benefits after she has been disabled for 182 days (LIB 1221).

31.    Ms. Collier's date of disability is May 15, 2018 with an eligible payment start date of November 16, 2018 (LIB 1).

32.    Lincoln hired Network Medical Review Co. ("NMR") to perform a peer review of Ms. Collier's medical records. NMR hired Dr. Akhil Chhatre to do so.  He completed his report of findings on May 8, 2019 (LIB 886-890).

33.    He opined that the evidence did not support any impairments from May 15, 2018 to the time he made the report on May 8, 2019. To support his conclusion, Dr. Chhatre points to the fact that Plaintiff had an old cervical MRI from 2016 and there have been stable exam findings with no new diagnostic testing. However, Ms. Collier had a lumbar MRI in February of 2019 which revealed anterior osteophytes at T12 down through L5, mild disc desiccation at L2-L3 down through L5-S1, and a 2.6mm disc bulge (LIB 500).

34.    Dr. Chhatre does not address this MRI.  He incorrectly notes that the shoulder MRI is undated, but it is dated July 5, 2017 (LIB 506-507).

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

7

**E.    Ms. Collier Appeals Lincoln's Denial of Her Claim**

35.    Through counsel, Ms. Collier appealed Lincoln's denial on October 24, 2019 and submitted over 500 pages of additional evidence, including a Functional Capacity Evaluation ("FCE"), updated Kaiser records, updated records from Synapse Medical Group (Drs. Haronian and Kohan), Ms. Collier's declaration, declaration of her daughter Nicolette Collier, declaration of her partner Duane Raha, her job performance evaluations, Dr. Haronian's response to Dr. Chhatre's peer review, and medical literature related to her medical conditions (LIB 850-855).

36.    On September 12-13, 2019, Ms. Collier attended a two-day-long FCE performed by Sebastian Jurado, who is a Doctor of Physical Therapy and a Certified Ergonomic Assessment Specialist (LIB 707-744). Ms. Collier was observed to provide full physical effort during the FCE as demonstrated by consistency on isometric testing and observed competitive performance behaviors, and heart rate measurements.

37.    The FCE revealed a number of limitations, which were especially pronounced on day two of the evaluation: abnormal upper and lower extremity dermatomes at bilateral C6-C8 nerves and bilateral L4-S1 nerves; decreased range of motion in the spine: 42% of norm with cervical extension, 44% of norm in cervical lateral left and right, 63% of norm in cervical rotation left and right, 33% of norm in lumbar flexion; decreased upper extremity range of motion bilaterally, ranging from 46% percent to 99%; and decreased muscle strength, primarily in elbow flexion, wrist flexion, and knee extension, which were even more present on day two of the testing. Ms. Collier was only able to type for 25 minutes while sitting on the first day before she had to stand up, and only for 15 minutes on the second day before having to stand up.

38.    Following the in-depth testing, the FCE examiner opined that Ms. Collier was unable to return to work. Dr. Kohan, Ms. Collier's pain management

specialist, concurred with the FCE findings (LIB 334).

39.    Dr. Haronian wrote a response to Dr. Chhatre's report (LIB 132-135). Dr. Haronian pointed out that the report makes no mention of the fact that Ms. Collier had surgery, but yet continued to have limitations. He goes on to state:

> The physician is not an orthopedic surgeon, but seems to be a Physical Medicine Rehabilitation Specialist. It also seems that the reviewing physician for some unknown reason has licensed to practice in five different states and perhaps performs evaluation only without actual treatment of patients. There is no indication that her range of motion was measured. The patient was declared permanent and stationary on January 31, 2019. At that time, the patient was still complaining of neck and shoulder pain. It was unlikely that the patient's condition would improve further for at least one year and that was the timing of the permanent and stationary status. In fact, the patient continued to be seen in my office and has continued to suffer from pain.
>
> …
>
> The QME [Akhil Chhatre] indicated that the patient's complaints to the lower back and the neck were present prior to her job at the Automobile Club. However, that does not dismiss the fact that the patient has continued to suffer from pain…I did provide work restrictions to multiple body parts including the shoulders that the patient would be precluded from working at/or above the shoulder level. It would be reasonable that the patient should avoid lifting more than 10 pounds and the patient should avoid repetitive power gripping, repetitive keying, repetitive grasping, and repetitive pinching due to her wrist complaints. Considering the above, it would be reasonable to indicate that the patient will not be able to perform her previous work activities as indicated in my report from January 31, 2019.

40.    Ms. Collier's daughter submitted a declaration describing how her mother's functioning has deteriorated over the last few year (LIB 343-346).

41.    Specifically, Nicolette Collier explained:

> This past year has been super difficult on my mom because of the pain in her shoulders and back that has affected her everyday life in numerous ways. Going from working many hours and exercising a couple of hours a day, my mom's exercise now consists of walking her dog around the block once or twice a day, and a lot of stretching, including stretching in a heated room. On her good day, she may walk a couple of miles as walking makes her feel better, but this is nowhere near the level of athleticism she used to have. In fact, she can't even seem to get herself up before 7am any day of the week. This past year I've had to assist my mom in some of the household chores, and I have to travel from San Luis Obispo to see her as she cannot bear the long drive.  She is so low on energy and can no longer perform to the best of

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

9

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

her ability as she used to. Her leg seems to be giving her a lot of pain along with her shoulders. She can't withstand long car rides anymore because after 30 minutes of sitting, she feels excruciating pain shooting through her leg and lower back. In order to visit my mom on weekends while I am away at college, I have to figure out rides there and back home because it is too painful for my mom to drive three hours to San Luis Obispo to visit me.

42.   Ms. Collier's partner, Duane Raha, stated:

After a few years of working at AAA Insurance, Vicki would come home complaining of discomfort in her neck and shoulder area. It progressively got worse and I would accompany her to her doctors' visits. After several months, there were times Vicki could not sleep due to the pain she was experiencing…In addition, based on a recommendation from one of her doctors, I purchased a special contour Memory Foam pillow to see if that would help along with two different types of Cervical Neck Traction Devices for her to try before going to bed at night. The pain continued to get progressively worse and since the pain was in her neck and shoulders, we could no longer continue our tennis or running activities, and on occasion we could only go for walks instead. The activities at the gym slowed down as did the yoga classes we attended. (LIB 348-351).

43.   Ms. Collier herself explained the effects of her pain on her life:

I live with chronic pain which is debilitating. I have pain every day in my neck, back, both shoulders, elbows, wrists, buttocks, and legs. The pain feels electrical in nature, that travels from my upper back down my legs and feet which have a numb/ tingling sensation. The pain in my buttocks and legs is so excruciating that I just want to cut my legs off (mainly my left leg). It gets worse after sitting for a period of time and standing for a period of time - my lower legs go numb. At most, I can sit for 35 minutes before my pain becomes worse. The pain also increases and travels down my back if I tilt my head up or down, or turn my head side to side. On a scale of 1-10, with 10 being the worst, my neck pain is 7-8/10. I have pain in both shoulders and am unable to sleep on either side. I often wake up with pain, finding myself on my side and have trouble sleeping. The pain in my shoulders is 7-8/10, but sometimes can be 10/10. The pain in both of my elbows radiates down to my forearms and fingers, with numbness and tingling. I have trouble moving my arms a certain way, rotating my elbows (they will just lock up) and with repetitive motion. I would rate my elbow pain as a 4-5/10. I have pain in both of my wrists that radiates down to the hands with numbness and tingling, making it difficult to perform fine motor movements such as writing or typing on a keyboard for long periods, and repetitive finger movements increase my pain, which is usually 4/10. Certain gripping, grasping, pushing, pulling, and rotating my wrists also increase my level of pain. I have pain in my upper back between the shoulder blades and in the lower back, which radiates down to my hips, buttocks, legs, and feet, with numbness and tingling. The pain worsens with sitting and standing, and the most I can sit or stand before my pain increases is 35 minutes. I would rate my back pain as

a 7-8/10, and occasionally it reaches 10/10. Sometimes I have sharp pain in my knees, with pain level of 6-7/10. I also have pain, numbness and tingling in both feet, with pain being about 7/10. I lose circulation in my right fingertips and feet, with the tips and pads of my feet turning white (almost blue). My physical symptoms and inability to do the things I used to enjoy doing has caused stress, depression, and anxiety. I enjoyed my job, I was good at my job, I was competitive and I earned a substantial living. (LIB 338).

44.    On appeal, Lincoln required Ms. Collier to undergo an Independent Medical Evaluation ("IME") with Dr. Katrina Vlachos (LIB 22-40).

45.    After examining Ms. Collier, Dr. Vlachos found several impairments with regards to Plaintiff's neck, shoulders, upper extremities (elbows and forearms), and lower back (LIB 22-40).

46.    She diagnosed Ms. Collier with cervical pain, cervical radiculopathy, bilateral shoulder pain; status post right shoulder rotation cuff tear, bilateral elbow pain, bilateral wrist pain, lumbar pain, and lumbar degenerative disc disease (LIB 34).

47.    Under the "Review of Systems" portion of the report, Dr. Vlachos stated: "significant for fatigue, depression, sleep difficulty, headaches, nervousness, stress, numbness, weakness, bowel problems, memory loss, loss of concentration, itching, tingling, and early awakening." (LIB 31).

48.    Dr. Vlachos discounted those non-exertional factors and opined that Ms. Collier is limited in her ability to sit for up to 30 minutes at a time with a five-minute position break; stand and walk for 30 minutes at a time with a five-minute break; occasional reaching in all planes; and occasional fingering, feeling, gripping, and grasping (LIB 37-38).

49.    Dr. Vlachos concluded that the restrictions and limitations would enable Ms. Collier to be functional at *some* job (emphasis added) (LIB 39). She did not state that Ms. Collier could return to her own occupation, although she had an opportunity to review the requirements of Ms. Collier's occupation.

50.    Ms. Collier submitted another declaration disputing Dr. Vlachos's findings, noting that there were several mistaken assumptions, omissions, minimal

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

11

physical examination (such as asking to reach up once, and walking the length of a medical bed), and a disregard of her pain complaints (LIB 65-71).

51.    Sebastian Jurado, who administered Ms. Collier's two-day FCE, reviewed Dr. Vlachos's report and acknowledged that some of Dr. Vlachos's findings were consistent with his own observations, but pointed out that MRI results did not provide a complete picture of Ms. Collier's functional capacity (LIB 62-63). In addition, Dr. Jurado emphasized how Plaintiff's abilities diminished on the second day of testing:

> Although Dr. Vlachos believes that the client may work a full-time position, 40-hours a week, her evaluation mentions how symptoms may be affected one day to another depending on the amount of physical activity performed. The client's ROM, strength, posture and functional performance declined on the second day of testing. The client presented with increased muscular guarding. During the first day of testing, the client was able to sit for up to 30 minutes until she had to stand up due to back pain. On the second day, the client's posture was more guarded and she was able to sit for up to 15 minutes continuously and the transition from sit to stand was slower and cautious. Although the client ambulated with a normal gait pattern on the first day of testing, her cadence slowed down on day two and her posture was guarded throughout all phases of gait. Therefore, it could be expected for the client to have greater difficulty on a third or fourth day of work based on objective findings. The client was consistent with testing on both days and her physical performance correlated with her subjective complaints of pain.

52.    Following the IME, Ms. Collier submitted an additional declaration of her long-time friend Lisa Tetreault, who stated:

> From three years ago to now Vicki has changed in so many ways physically. She can no longer work out as she once did. She has confided in me that she has been on pain pills for a very long time. I have witnessed her body, once strong lean muscle mass, become very thin, with very little muscle mass and limited in what she can do as exercise or hobbies. I know Vicki would like to work out like she used to and to be able to do things she once enjoyed. She complains that she feels her body is turning into a bag of bones and that her skin is starting to hang off the bones. She is unable to visit her daughters as much as she would like as she said it is difficult for her to drive or fly. She would like to play golf with her partner but unable.
>
> I have seen countless arm and shoulder surgeries over the years in my profession. Vicki's surgery was expected to have restored her back to a somewhat normal status. Instead, the pain spread shortly after the surgery and it just continued to get worse and has affected many other parts of her body. I have not seen any improvements in her health.

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

12

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

(LIB 74-76).

## F.   Lincoln Upholds the Denial of Ms. Collier's Claim

53.   On April 16, 2020, Lincoln upheld the denial of Ms. Collier's claim (LIB 12-19).

54.   Ms. Kimberly Murray, Lincoln's Appeals Consultant, acknowledged that although Ms. Collier may have continued to experience some impairments and symptoms associated with her condition, there were no physical exam findings, diagnostic test results or other forms of medical documentation supporting her impairments and symptoms that would have resulted in an inability to perform the duties of her own occupation (LIB 17).

55.   Ms. Collier filed this action on May 1, 2020.

## II.   Conclusions of Law

## A.   The Standard of Review Is *De Novo*

56.   In ERISA benefit cases, the default standard of review is *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).

57.   The parties agree that *de novo* is the correct standard of review in this case.

58.   The Court has accepted the stipulation of the parties as to a de novo standard of review because a claim administrator such as Lincoln is only entitled to deferential review if it can demonstrate that the plan validly grants it discretionary authority to interpret the plan or determine benefit eligibility. *Id. At* 114-15; *Orzechowski*, 856 f.3d at 695.

59.   Here, the policy insuring the LTD Plan contains no language conferring discretionary authority on Lincoln. Furthermore, there are no other documents in the record conferring or attempting to confer such authority. As a result, the proper standard of review is *de novo*.

60.   Under *de novo* review, "the court is not technically 'reviewing' any

13

decision, but rather making its own independent determination about the merits of the dispute and the employee's entitlement to benefits." *Fontaine v. Metropolitan Life Ins. Co.*, 2014 WL 1258353, at *12 (N.D. Ill. Mar. 27, 2014), *aff'd*, 800 F.3d 883 (7th Cir. 2015).

61.   Thus, in performing its review, the court "review[s] the case with a fresh eye." *Id.* No deference is given to any part of the claim administrator's decision. Instead, the court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec constr. Mgmt. Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).

62.   "In other words, [the court] stand[s] in the shoes of the administrator to determine whether the administrative decision was correct." *Adele E. v. Anthem Blue Cross*, 183 F.Supp.3d 173, 181 (D. Me. 2016) (quoting *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010)).

**B.   Ms. Collier Bears the Burden of Proof to Establish that She Is Entitled to Benefits.**

63.   Ms. Collier has the burden of proof in this case. *Muniz*, 623 F.3d at 1294.

64.   Under this burden, Ms. Collier is entitled to judgment if she can demonstrate by a preponderance of the evidence that she was entitled to benefits under the LTD plan.

65.   In other words, Ms. Collier must demonstrate that she was "unable to perform with reasonable continuity the Substantial and Material acts necessary to pursue" her "own occupation" in the usual and customary way due to injury or sickness. (LIB 1225). After November 16, 2019, she must demonstrate that she is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury, she is not able to engage with reasonable continuity in any occupation in which she could reasonably be expected to perform satisfactorily in light of his age, education, training,

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

experience, station in life, and physical and mental capacity.

## C.     Ms. Collier Has Met Her Burden of Proof

66.     The record shows that Ms. Collier has met her burden of proof.

67.     The nature of Ms. Collier's "own occupation" as an insurance agent for AAA required constant computer use and required a high level of cognitive skills and abilities to accurately perform her duties (LIB 785-787).

68.     Ms. Collier's ongoing complaints of pain in many body parts have been corroborated by her two primary treating physicians, Dr. Haronian and Dr. Kohan, as well as her surgeon Dr. Tun.

69.     The record further shows the limiting nature of Ms. Collier's symptoms and the side effects of her medications. Ms. Collier reports that Norco causes anxiety, dizziness, drowsiness, constipation, lightheadedness, headache, brain fog, dry mouth, ringing in ears, blurred vision, and mood changes. Cymbalta causes dry mouth, constipation, fatigue, brain fog, hypersomnia, insomnia, restlessness, tension, agitation. Gabapentin causes constipation, unsteadiness, dry mouth, fatigue, brain fog, dizziness, blurred vision (LIB 70).

70.     Her symptoms are clearly inconsistent with performing any kind of full-time work, not to mention the job Ms. Collier had, which required focus, attention to detail, accuracy, advanced organizational skills, people skills, and constant computer use (LIB 785-787).

## D.     Ms. Collier Was Supported by Her Physicians.

71.     Ms. Collier treated with several doctors who supported her disability, such as Drs. Haronian, Kohan, and Tun.

72.     As Ms. Collier's treating provider since September 2018, Dr. Haronian has continually supported her disability claim based on objective testing and her credible subjective symptoms and objective examinations (LIB 523-533).

73.     Dr. Haronian declared Ms. Collier "permanent and stationary" in January 2019 (LIB 523-533) and reaffirmed her inability to work in September

15

2019 (LIB 329-331).

74.     Dr. Kohan declared Ms. Collier "permanent and stationary" in August 2019 (LIB 95-97) and continued her medication regimen.

75.     Dr. Tun issued several work restriction reports precluding typing and use of both shoulders and arms (LIB 1091, 1117, 1115).

**E.     Ms. Collier Was Not Required to Submit Objective Evidence of Her Disability but Did Nonetheless.**

76.     Lincoln's primary complaint is that Ms. Collier's record does not contain "physical exam findings," "diagnostic test results," or "medical documentation" to support her symptoms (LIB 17).

77.     However, Ms. Collier was not required to provide objective evidence of her disability. The definition of disability in the LTD Plan does not include any objective evidence requirement (LIB 122), nor is there any other provision in the LTD Plan imposing such an obligation. *See Vancy v. United of Omaha Life Ins. Co.*, 2015 WL 9311729 at *19 (C.D. Cal. Dec. 18, 2015) ("the court agrees with plaintiff that defendant effectively construed the plan as requiring objective, as opposed to subjective, evidence in order to approve plaintiff's claim").

78.     Likewise, no provision in ERISA or its enforcing regulations requires a claimant to submit objective evidence.

79.     The reason why such evidence is not required is because courts have recognized that many disabling symptoms are either not measurable or difficult to measure by objective diagnostic methods. As the Ninth Circuit stated, "many medical conditions depend for their diagnosis on patient reports of pain or other symptoms, and some cannot be objectively established." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); *see also Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196 (11th Cir. 2007), *reh'g granted, opinion vacated in part*, 506 F.3d 1316 (11th Cir. 2007), *and adhered to in part on reh'g*, 546 F.3d 1353 (11th Cir. 2008) ("indeed, the only evidence of a qualifying disability may

sometimes be the sort of evidence that [defendants] characterize as 'subjective,' such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms."); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) ("pain often…cannot be detected by laboratory tests"); *Perryman v. Provident Life & Acc. Ins. Co.*, 690 F.Supp.2d 917, 945-946 (D. Ariz. 2010) (cannot discount opinions of treating physicians because they relied on subjective complaints); *Jahn-Derian v. Metropolitan Life Ins. Co.*, 2016 WL 1355625 at *9 (C.D. Cal. Mar. 31, 2016) ("subjective complaints can form the basis of a disability claim, even when no objective medical evidence is available to verify or measure the pain").

80. In short, the rule in the Ninth Circuit is that a claim administrator cannot "condition[] an award on the existence of evidence that cannot exist[.]" *Salomaa*, 642 F.3d at 678.

81. Nevertheless, even though Ms. Collier was not required to submit objective evidence, she did so anyway. *See Jahn-Derian*, 2016 WL 1355625 at *7 ("while defendant may not, under controlling Ninth Circuit law, impose a requirement on a beneficiary to provide objective evidence for a condition that cannot be objectively verified or measured, in this case plaintiff did provide objective medical evidence—which defendant improperly rejected—to support the degree of severity of her subjective pain complaints") (quotations and citations omitted).

82. Ms. Collier's physical examinations and the FCE objectively document her impairments.

83. There is no reason to question the credibility of Dr. Jurado's findings, as his selection as an FCE provider to preform testing was independent of Ms. Collier and her counsel (*see* Declaration of Glenn Kantor ¶¶ 2, 5, 6, 9, and Ex. A and B thereto).

84. In addition to the FCE, Ms. Collier has been prescribed multiple

medications, including Norco and gabapentin, and received Botox injections for her migraine headaches, which constitutes objective evidence of disability. The court in *Hamid v. Metro. Life Ins. Co.*, No. 20-CV-01601-VC, 2021 WL 405225, at *12 (N.D. Cal. Feb. 5, 2021), stated:

> Moreover, there are indeed objective indications that Hamid was disabled beyond just his self-reported symptoms. Most saliently, his medical records show that in the months before and after he stopped working he pursued a full-fledged, multi-faceted attempt to alleviate his pain through a range of treatment options, including evaluation by a pain management consultant and a variety of specialists in the fields of neurology, otolaryngology, rheumatology, and infectious disease; receiving Botox injections and an accelerated round of allergy injections (the latter of which caused severe allergic reactions); and undergoing two surgical sinus procedures (in March 2018 and December 2019), both of which caused extreme pain and discomfort. This itself is objective evidence of Hamid's disability. *Cf. Montour*, 588 F.3d at 635 (holding medical records suggesting claimant "had not recently engaged in any pain treatment programs" constituted "objective" evidence supporting denial of benefits); *see also Holmgren*, 354 F. Supp. 3d at 1029 (finding it telling that "plaintiff sought treatment for his pain at least as early as 2008 and continued to seek a firm diagnosis and treatment throughout his disability application and appeal, including three invasive surgical operations"). In addition, Hamid was prescribed numerous powerful drugs, including various opioids and ketamine, which also constitutes objective evidence of Hamid's impairment.

85. In short, Ms. Collier has presented sufficient evidence, including objective evidence, that she is unable to return to her own occupation due to her multiple impairments.

**F.    Ms. Collier Is Credible.**

86. Lincoln does not dispute that Ms. Collier has vigorously pursued treatment and is seeing appropriate physicians.

87. The record does not reflect that Ms. Collier was trying to avoid working. The record demonstrates that she enjoyed her job and was excellent at it (LIB 746-796).

88. The record demonstrates consistent efforts by Ms. Collier to find an accurate diagnosis and effective treatment for her condition (LIB 337). She has undergone extensive physical therapy, surgery, and was prescribed multiple

18

medications. A claimant who is malingering or fabricating is unlikely to go to these lengths.

89. The credible statements of Ms. Collier and her physicians, in conjunction with the other supporting evidence in the record, both objective and subjective, are more than sufficient to demonstrate that she met the policy definition of disability. *See Demer v. IBM Corp. LTD Plan,* 835 F.3d 893, 905-06 (9th Cir. 2016) ("we will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility"); *Oliver*, 497 F.3d at 1197 (plaintiff's "submission of uncontroverted medical evidence of the only sort available to prove his disability – including medical reports from multiple physicians stating that his reports of pain were consistent with their diagnoses and 'did not appear to be histrionic or exaggerated'" were evidence of an unreasonable benefit denial); *Salomaa*, 642 F.3d at 676 (plaintiff's physicians "rule[d] out malingering. Every one of them concluded, often in dramatic language, that Salomaa was totally disabled by his physical condition. Not a single physician who actually examined Salomaa concluded otherwise.")

**G.   The Opinions of Ms. Collier's Physicians Are Entitled to More Weight than the Opinions of Lincoln's Physicians.**

90. Courts are not required to defer to the opinions of a claimant's treating physician in ERISA benefit cases. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832-34 (2003).

91. However, under the *de novo* standard of review, Lincoln's physicians are also not entitled to any special deference. Evidence from all of the doctors in this case must be given whatever weight it deserves according to its credibility and reliability, as *Nord* recognizes: "plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

92.     Here, Ms. Collier's doctors had the opportunity to treat her over a significant period of time and observe her over that time. "[A]lthough the opinion of a treating physician gets no special weight, the district court may take cognizance of the fact (if it is a fact in a particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator[.]" *Shaikh v. Aetna Life Ins. Co.*, 2020 WL 1430496 at *4 (N.D. Cal. Mar. 24, 2020).

93.     Lincoln does not question the competence of Ms. Collier's physicians, who are board-certified in their respective specialties. The record demonstrates that they thoroughly evaluated Ms. Collier's complaints and issued comprehensive treatment plans. As a result, Lincoln has given the Court no reason to question their findings and conclusions.

94.     Furthermore, there is no indication in the record that Plaintiff's physicians questioned the seriousness of her condition.

95.     On the other hand, Lincoln's IME physician spent a mere 50 minutes, of which only 10 involved an actual physical examination. Dr. Chhatre did not spend any time with Ms. Collier at all and was not an orthopedic specialist. As a result, the Court views the reports of Lincoln's physicians, specifically Dr. Chhatre, more skeptically. *See, e.g., Salomaa*, 642 F.3d at 676 ("the medical record by physicians who actually examined Salomaa is entirely one sided in favor of Salomaa's claim. The plan rejected its opportunity to see if there was another side."); *Demer*, 835 F.3d at 905-06 ("there is nothing inherently objectionable about a paper review, but such reviews are particularly troubling when the administrator's consulting physicians—who have never met the claimant— discount the claimant's limitations as subjective or exaggerated") (quoting *Godmar v. Hewlett-Packard Co.*, 631 Fed.Appx. 397, 406 (6th Cir. 2015)); *Fleming*, 2018 WL 6133859 at *10 ("the court declines to credit [Unum's physician's] opinion over those of the medical evaluators who consistently examined Fleming in

person.").

96.    ERISA regulations require reviewing physicians to have "appropriate training and experience in the field of medicine involved in the medical judgment[.]" 29 C.F.R. § 2560.503-1(h)(3)(iii).

97.    As a result, the Court places significantly more weight on the opinions and conclusions of Ms. Collier's physicians, who were well qualified, had the benefit of in-person evaluation of Ms. Collier, and persuasively articulated the basis for their conclusions.

## III.    Conclusion

98.    For the reasons stated herein, the Court finds in favor of Ms. Collier.

99.    Lincoln's decision to deny Ms. Collier's claim for LTD benefits was erroneous and is hereby overturned.

100.    Ms. Collier shall be reinstated to the LTD Plan and is awarded LTD benefits to date, interest on past benefits due, and reasonable costs and attorneys' fees as provided by ERISA.

101.    Counsel shall meet and confer within 30 days in an attempt to resolve the amounts due to Ms. Collier as a result of this order.

102.    If the parties are unable to reach a resolution of these issues, Ms. Collier shall file a motion within 45 days of the entry of this order.

103.    Counsel for Ms. Collier shall prepare a judgment in accordance with the foregoing.

**IT IS SO ORDERED.**

Date: _____    By: _____
                                         Honorable James V. Selna
                                         United States District Judge

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

Submitted By:  */s/ Glenn R. Kantor*

Glenn R. Kantor,
Zoya Yarnykh
Attorneys for Plaintiff,
VICKI COLLIER

KANTOR & KANTOR, LLP
1050 Marina Village Pkwy., Ste. 105
Alameda, California 94501
(510) 992-6130

22