Jenny H. Wang CA Bar No. 191643
jenny.wang@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:   714-800-7900f
Facsimile:    714-754-1298

Kristina N. Holmstrom, AZ Bar No. 023384 (Admitted Pro Hac Vice)
kristina.holmstrom@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Esplanade Center III
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: 602-778-3724
Fax: 602-778-3750

Attorneys for Defendant
LINCOLN LIFE ASSURANCE COMPANY OF BOSTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI COLLIER<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON<br><br>Defendant. | Case No. 8:20-cv-00839-JVS-KES<br><br>**DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S OPPOSITION TO PLAINTIFF'S TRIAL BRIEF**<br><br>Complaint Filed: May 1, 2020<br>District Judge:    Hon. James V. Selna<br>Magistrate Judge:Hon. Karen E. Scott<br>Trial Date: March 29, 2021, 3:00 pm |

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   FAR FROM PROVING HER CLAIM, PLAINTIFF PROVIDED EVIDENCE THAT SHE WAS ABLE TO PERFORM HER OCCUPATION. ...................................................................................2

    A.    Three Separate Physicians Provided Contemporaneous Restrictions And Limitations During The Elimination Period And None Opined That Plaintiff Was Precluded From Performing Her Own Occupation Throughout The Elimination Period. ..........................2

    B.    Plaintiff Continues To Be An Unreliable Narrator Of Her Functionality. ...................................................................................4

    C.    Plaintiff's Friends And Family Are Even Less Reliable. .......................6

    D.    The FCE Commissioned By Plaintiff's Counsel Is Likewise Unreliable. ...................................................................................7

    E.    Plaintiff's Occupation Is Mostly Sedentary, But May Require Light-Duty Activities Such As Increased Walking Or Standing. ......... 10

III.  LINCOLN APPROPRIATELY GAVE SIGNIFICANT WEIGHT TO THE OPINIONS OF DRS. CHHATRE AND VLACHOS, WHO ARE BOTH QUALIFIED AND INDEPENDENT. ......................................... 10

    A.    The Attacks On Dr. Chhatre Are Baseless........................................... 11

    B.    Dr. Vlachos Performed A Thorough IME And Reached Conclusions That Were Supported By The Records And Even Accounted For Plaintiff's Subjective Complaints. .............................. 13

    C.    Dr. Vlachos Appropriately Offered A Medical Opinion, Not A Vocational Opinion. ................................................................... 14

IV.   IT IS APPROPRIATE FOR LINCOLN (AND THE INDEPENDENT PHYSICIANS) TO CORRELATE PLAINTIFF'S PAIN COMPLAINTS TO FINDINGS. ....................................................... 15

    A.    Collier's MRIs Do Not Prove Her Claim. ........................................... 15

    B.    Plaintiff's Workers Compensation Findings Do Not Prove Her Claim. ...................................................................................... 17

    C.    A Diagnosis Does Not Prove A Disability. ......................................... 19

V.    PLAINTIFF HAS NO EVIDENCE TO SUPPORT HER LITIGATION ARGUMENT THAT HER MEDICATIONS DISABLED HER. .................. 20

    A.    Plaintiff's Doctors Never Offered Any Opinion That Plaintiff Was Impaired By Her Medication. ...................................................... 20

B.    Plaintiff Has A Long History Of Being Able To Work While On Her Medications. ........................................................................................... 21

C.    Plaintiff's Medications Remained Consistent During Her Claim And The Records Show She Had No Side Effects That Impaired Functionality. ....................................................................................................... 22

VI.    PLAINTIFF CANNOT OBTAIN "ANY OCCUPATION" BENEFITS IN THIS LAWSUIT. ..................................................................................... 23

VII.    CONCLUSION. .................................................................................... 24

Case No. 8:20-cv-00839-JVS-KES
DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bailey v. Provident Life & Accident Ins. Co.*,
  2000 WL 33980014 (N.D. Fla. June 13, 2000).........................................................3

*Brannon v. BellSouth Telecommunications, Inc.*,
  318 Fed. Appx. 767 (11th Cir. 2009) ....................................................................11

*C.f. Thompson v. Astrue*,
  2012 WL 5989199 (W.D. Pa. Nov. 29, 2012)........................................................14

*Caplan v. CNA Fin. Corp.*,
  544 F.Supp.2d 984 (N.D. Cal. 2008)..................................................................9, 10

*Coffman v. Metro. Life Ins. Co.*,
  217 F. Supp. 2d 715 (S.D. W.Va. 2002) ..................................................................4

*Gevas v. Shearing*,
  2016 WL 1221937 (S.D. Ill. Mar. 29, 2016)..........................................................21

*Hawley v. Life Ins. Co. of N. Am.*,
  2009 WL 10694819 (E.D. Cal. June 5, 2009).........................................................11

*Holden v. Blue Cross & Blue Shield of Texas, Inc.*,
  2008 WL 4525403 (S.D. Tex. Sept. 30, 2008)........................................................11

*Holmstrom v. Metro. Life Ins. Co.*,
  615 F.3d 758 (7th Cir. 2010) ...................................................................................9

*Jacobson v. SLM Corp. Welfare Ben. Plan*,
  2009 WL 2841086 (S.D. Ind. Sept. 1, 2009)..........................................................12

*Jones-Stott v. Kemper Lumbermans Mut. Cas. Co.*,
  2007 WL 470474 (E.D. Mich. Feb. 7, 2007) ...........................................................4

*Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*,
  370 F.3d 370 (9th Cir. 2004) .................................................................................19

*Matthews v. Shalala*,
  10 F.3d 678 (9th Cir. 1993) ...................................................................................19

*Nance v. Sun Life Assur. Co. of Canada*,
  294 F.3d 1263 (10th Cir. 2002).................................................................................8

*Pagan v. Nynex Pension Plan*,
  846 F. Supp. 19 (S.D.N.Y. 1994), aff'd, 52 F.3d 438 (2d Cir. 1995) ...................17

*Sangha v. Cigna Life Ins. Co. of New York*,
  314 F. Supp. 3d 1027 (N.D. Cal. 2018)....................................................................9

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

*Seleine v. Fluor Corp. Long-Term Disability Plan*,
598 F. Supp. 2d 1090 (C.D. Cal. 2009), *aff'd, Seleine v. Fluor Corp. Long-Term Disability Plan*, 409 Fed. Appx. 99 (9th Cir. 2010) ............................ 19

*Sullivan v. Prudential Ins. Co. of Am.*,
2020 WL 6817327 (D. Ariz. Nov. 20, 2020) ................................................. 12, 14

*Tam v. First Unum Life Ins. Co.*,
2020 WL 5904804 (C.D. Cal. Sept. 30, 2020) ................................................ 23, 24

*Utter v. UNUM Life Ins. Co. of America*,
404 F. Supp. 2d 1204 (C.D. Cal. 2005) ........................................................ 20, 23

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

# I.    INTRODUCTION

Plaintiff Vicki Collier asks this Court to award her long-term disability ("LTD") benefits because she says she has pain that prevents her from performing her insurance agent occupation. ERISA and the Group Policy at issue here require more than that. To obtain benefits, Plaintiff must establish, based on more than her own say-so, that she cannot perform the Substantial and Material Acts of her occupation beyond her elimination period (May to November 2018). She did not. Plaintiff initially left work complaining of shoulder and neck pain that radiated into her arms. Her own doctors released her to return to work with reasonable restrictions during the elimination period. After the elimination period expired, Plaintiff began to focus on lumbar pain and difficulty sitting. No treating physician ever restricted her ability to sit (during the elimination period or beyond). Plaintiff underwent a Qualified Medical Examination for a workers compensation claim that did not establish functional restrictions that preclude her from performing her occupational duties. Lincoln obtained a records review from an independent board-certified physician (retained through a third-party vendor) who found no restrictions. Lincoln—correctly— determined Plaintiff had not proven her claim.

On appeal, Plaintiff's attorney commissioned an FCE that found restrictions and limitations as to sitting, standing, and walking that were grossly out of line with any restrictions imposed by any doctor who examined Plaintiff or her records. Through a vendor, Lincoln obtained an IME from an independent board-certified physician. Even giving significant weight to Plaintiff's subjective pain complaints, the IME revealed that Plaintiff could perform her occupation with some reasonable modifications, just as her treating doctors had been saying. In this case, Plaintiff has presented nothing but her subjective complaints of pain and an FCE that adopted those complaints wholesale and against all other evidence. Quite simply, Plaintiff failed to prove her claim and Lincoln honored its fiduciary duty by not paying it. The Court should uphold Lincoln's decision.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

## II.  FAR FROM PROVING HER CLAIM, PLAINTIFF PROVIDED EVIDENCE THAT SHE WAS ABLE TO PERFORM HER OCCUPATION.

The Group Policy at issue here requires Plaintiff to prove that she is prevented by injury or sickness from performing the Substantial and Material Acts of her Own Occupation. (Dtk. 19, at 6.) "'Substantial and Material Acts' means acts that are normally required for the performance of the Covered Person's Own Occupation and *cannot be reasonably omitted or modified*." (1228 (emphasis added).) Plaintiff must prove she is precluded from performing those acts for her entire elimination period: May 15, 2018 to November 15, 2018. (Dtk. 19, at 6.) She failed to do so.

### A.  Three Separate Physicians Provided Contemporaneous Restrictions And Limitations During The Elimination Period And None Opined That Plaintiff Was Precluded From Performing Her Own Occupation Throughout The Elimination Period.

Plaintiff did not even submit her claim until three months after the elimination period ended. Fortunately, in her quest to support her workers compensation claim, three different physicians examined her during the elimination period (May through November 2018) and opined as to her functional restrictions and limitations.[1] None of the functional restrictions precluded Plaintiff from the Substantial and Material Acts of a full-time office job with potentially increased standing/walking:

---

[1] Although Plaintiff refers in passing throughout her brief to migraines, no physician has ever suggested Plaintiff has functional impairment from migraines. Rather, the records show Plaintiff successfully treated her migraines with Botox. (*See, e.g.*, 175, 413.) Dr. Haronian did not even include migraines in his diagnosis. (964.)

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

| Date | Doctor | R&Ls |
|------|--------|------|
| 5/14/18 | Dr. Tun | "No typing. No use of both shoulders and arms." Through 7/15/18. (1125.) |
| 7/6/18 | Dr. Tun | "No typing. No use of both shoulders and arms." "***The patient was evaluated and deemed able to return to work at full capacity on 9/1/2018***." (1117 (emphasis added).) |
| 8/27/18 | Dr. Tun | "No typing. No use of both shoulders and arms." "***The patient was evaluated and deemed able to return to work at full capacity on 11/1/2018***." (1091 (emphasis added).) |
| 9/5/18 | Dr. Haronian | "[S]he may return to the workplace, but should not lift, push, or pull more than 10 pounds. She should not perform bending, twisting activities, or place the spine in unusual or awkward positions. She should not perform repetitive hand motions, pinching, or grasping bilaterally." (965.) |
| 10/10/18 | Dr. Haronian | "Her current work restrictions will continue." (953.) |
| 10/24/18 | Dr. Arora | "[A]void any heavy lifting more than 20 pounds and reaching above her head." (381) |
| 11/14/18 | Dr. Haronian | "We will continue with modified work activities." (949.) |

Significantly, no doctor ever said Plaintiff could not work for the duration of the elimination period. To the contrary, Dr. Tun said she could return to work at full capacity on November 1, 2018 and Dr. Haronian said she could return to the workplace with reasonable modifications.[2] Dr. Arora never opined that she would be unable to work for any period. Moreover, no doctor placed any restrictions at all on Plaintiff's ability to sit, stand, or walk during that time frame. Nor did any doctor impose cognitive restrictions (due to medication or anything else). The only office-based job activity potentially implicated by Dr. Haronian's restrictions (Dr. Tun's restrictions ended before the elimination period ended) is computer work. But as Lincoln correctly noted, "ergonomic equipment is readily available," including voice-activated software for computer work, if it became painful. (15-16.)

[2] Plaintiff cites to a September 5, 2019 (nearly 10 months after the elimination period) office visit note from Dr. Haronian suggesting that he independently determined "the severity of the pain dominated virtually every conscious moment producing physical and psychological debilitations." (Dkt. 18, at 11.) A review of the office visit note, however, indicates he simply recorded her own self-reports (made while she was working with counsel to submit her LTD appeal). It is clear that Dr. Haronian did not adopt that statement as his own opinion because he indicated "work status remains unchanged," that is, she was able to return to work full time within the restrictions he had originally imposed. (100.) Surely Dr. Haronian would not have released Plaintiff to return to work if he believed pain dominated every moment of her life and psychologically debilitated her.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

**B.    Plaintiff Continues To Be An Unreliable Narrator Of Her Functionality.**

Plaintiff continues to demand that Lincoln and the Court take her at her word. Aside from the fact that if that were the standard, insurers would have to either pay or disprove all claims,[3] here, there is good reason not to. In her Trial Brief, Plaintiff gives a timeline of the complaints giving rise to her claim, saying she "was a very active and physically fit woman most of her life and was in good health until 2016, at which point she began experiencing neck, back, and bilateral shoulder pain that radiated to both upper and lower extremities." (Dkt. 18, at 9.) She does not cite any support from the administrative record to support that characterization.[4] This is the narrative that Plaintiff invented for her workers compensation claim which Dr. Arora, the Qualified Medical Examiner assigned to her workers compensation claim, thoroughly debunked. (405-06.) Dr. Arora, who did not have Plaintiff's entire medical file when he performed the QME, noted his concerns upon receiving the medical file a couple weeks later:

> [T]here are a lot of differences between her history . . .and the medical records provided to me.
>
> . . .
>
> Over the last 16 years [since 2002, not 2016, as Plaintiff claimed], she has received several treatments with chiropractic treatment for her different musculoskeletal problems including the neck and the lower back, right shoulder especially in the past 10 years or so, which is

---

[3] *See, e.g, Bailey v. Provident Life & Accident Ins. Co.*, 2000 WL 33980014, at *4 (N.D. Fla. June 13, 2000) ("Although . . . subjective information should be considered, . . . reliance on such complaints, without more, would result in insurance companies paying virtually all claims."); *Coffman v. Metro. Life Ins. Co.*, 217 F. Supp. 2d 715, 732 (S.D. W.Va. 2002) ("Were an opposite rule to apply, LTD benefit would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional"); *Jones-Stott v. Kemper Lumbermans Mut. Cas. Co.*, 2007 WL 470474, at *9 (E.D. Mich. Feb. 7, 2007) ("In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question") (internal quotation omitted).

[4] Plaintiff goes on to explain that her condition causes pain with motions like "reaching up behind the back or reaching up overhead." (Dkt. 18, at 9.) There is no evidence that Plaintiff's occupation requires such motions.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

reflected in her medical records sent to me.

(406.)

Rather than acknowledging the true progression of her pain complaints, Plaintiff attacked Dr. Arora, making handwritten criticisms throughout his report. (*See, e.g.*, 404-09.) Although many of the handwritten notes are now illegible, it is clear that she was lashing out because she disagreed with his conclusions. (*See, e.g.*, 408 ("False!! He had my medical records.") ("Might? How can he determine without any retesting."), 409 ("what human being has not seen a doctor at some point").)

Plaintiff would repeat this behavior, submitting a scathing declaration after receiving Dr. Vlachos's IME report and disagreeing with her conclusions as well. (*See, e.g.*, 68.) For instance, Plaintiff described it as a "mistake[] . . . with no basis in reality" that Dr. Vlachos noted Plaintiff was by herself for the IME. (*Id.*) But Plaintiff admits that she was alone for the actual examination, despite having her partner in the waiting room. (*Id.*) Similarly, Plaintiff criticized Dr. Vlachos for asking whether Plaintiff had seen a rheumatologist or had any electro tapping testing, apparently on the basis that it was improper for Dr. Vlachos to ask about potential prior treatment when she already had Plaintiff's medical records. (*Id.*) In other words, Plaintiff feigned offense at Dr. Vlachos taking a thorough history. (*Id.*) And although Dr. Vlachos specifically recorded that Plaintiff "perceives numbness in her fingers and toes," Plaintiff lambasted Dr. Vlachos for not also noting in her IME report that Plaintiff had shown Dr. Vlachos that Plaintiff's toes were white.

Plaintiff also twisted the facts to fit her criticism when she claimed "My weight at the exam [was] 118 pounds, nothing was mentioned or noted about the weight loss from 130 – 118 in the last two years," going on to accuse Dr. Vlachos of ignoring things like muscle loss. (*Id.*) Except Dr. Vlachos's report is clear that 118 pounds was Plaintiff's "*stated* . . . weight." (306 (emphasis added).) In other words, Dr. Vlachos did not weigh Plaintiff and simply accepted her self-reported weight. Contrary to Plaintiff's weight loss claim, her medical records reflect that she was consistently

between 124 and 130 pounds from 2006 to 2019. (361, 367, 419, 573, 599, 670.)

Beyond that, in criticizing Dr. Vlachos, Plaintiff admits she is capable of sitting for 45 minutes. (69.) This is wholly at odds with her subjective performance on the FCE (see below), in which she purportedly could only sit for 30 minutes the first day and 15 minutes on the second. (741.)

Finally, Plaintiff claims that she had taken pain medication the evening prior to the IME and again in the morning. (69.) Presumably she wants to discount the physical functionality that she demonstrated at the IME; however, if this is true, it belies the laundry list of side effects she now claims the medication causes her as she did not demonstrate any of those effects during the IME. (70)

In addition to the unfounded criticism leveled at Dr. Vlachos, Plaintiff submitted a statement full of inconsistencies. For instance, Plaintiff insisted Dr. Tun advised her to leave work, but that is inconsistent with Dr. Tun's note in which he simply reported that she would be leaving her job. (337, 1119.) Plaintiff also claims side effects from medications that are not just absent from, but actively refuted by, her medical records. (*Compare* 337 *with* Section V.) She claimed "at most I can sit for 35 minutes," but then went on to sit comfortably at her IME for at least 45 minutes. (*Compare* 337 *with* Section III.B.) Finally, in trying to support her claim, Plaintiff told Lincoln "[m]y fitness routine is limited to stretching, light weights and walking that physical therapy has taught me." (339.) But she reported to her doctors that she engaged in regular vigorous exercise, including biking. (Dkt. 19, at 11, 15.).

Plaintiff's self-reported complaints, history, and critiques of third-party examiners are not reliable. This is also why subjective range of motion testing (in Plaintiff's case, wildly variable) cannot prove her claim. (Dkt. 19, at 25-26.) As such, Lincoln correctly gave her subjective self-assessments, little weight.

### C.     Plaintiff's Friends And Family Are Even Less Reliable.

In its Trial Brief, Lincoln cited to a number of cases demonstrating that statements by friends and family are entitled to little weight. (Dkt. 19, at 26-27.) That

Case No. 8:20-cv-00839-JVS-KES
DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

is particularly true in this case, where the statements from Plaintiff's friends and family are flatly inconsistent with the records.

For instance, Plaintiff's daughter echoed the inaccurate description of Plaintiff's exercise routine, claiming: "[g]oing from working many hours and exercising a couple of hours a day, my mom's exercise now consists of walking her dog around the block once or twice a day, and a lot of stretching, including stretching in a heated room." (343.) Again, this defies Plaintiff's own statements to doctors that she continued to bike and otherwise exercise vigorously. Similarly, Plaintiff's friend, Lisa Tetreault, declared "I have witnessed her body, once strong lean muscle mass, become very thin, with very little muscle mass and limited in what she can do as exercise or hobbies." (74.) This tracks Plaintiff's late and inaccurate claim of muscle loss/atrophy in the face of her weight remaining stable for decades. (*See* Section B.) While it is understandable that Plaintiff's friends and family would want to support her, their statements deserve little weight, as they are entirely inconsistent with the records.

**D.    The FCE Commissioned By Plaintiff's Counsel Is Likewise Unreliable.**

Lincoln pointed out the inherent weaknesses in the FCE performed by a biased non-physician hired by Plaintiff's lawyer that found restrictions and limitations that supposedly preclude any full or part time work, wholly out of line with even the opinions of treating physicians, Drs. Tun and Haronian. (Dkt. 19, at 20-22.) And yet, Plaintiff continues to rely heavily on the FCE.[5]

A detailed comparison between Dr. Vlachos's IME and Mr. Jurado's FCE reveals why his conclusions are unsound. Dr. Vlachos and Mr. Jurado *agree* that that Plaintiff can reach, finger, feel, grip, and grasp[6] occasionally. (312, 708.) They also

---

[5] Plaintiff argues that Dr. Chhatre was the wrong kind of doctor to assess her functionality, but yet relies on Mr. Jurado, who is not a medical doctor at all.

[6] Mr. Jurado uses slightly different terminology for the hand and finger movement, but the two reports are discussing the same type of movements.

7                    Case No. 8:20-cv-00839-JVS-KES
DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

have similar opinions on how much weight Plaintiff can lift, carry, push, and pull. (311, 708.) Their opinions differ significantly, however, concerning Plaintiff's ability to sit, stand, and walk. First, and critically, both Dr. Vlachos and Mr. Jurado examined Plaintiff long after her elimination period expired (Mr. Jurado 10 months, Dr. Vlachos 14 months). Critically, ***not one physician ever opined that Plaintiff was restricted from sitting, standing or walking during the elimination period***.[7] (*See* Table, at 3, *supra*.) Mr. Jurado's contrary opinion is thus irrelevant on that basis alone. But even assuming the increased findings in the IME and FCE can somehow shed light on Plaintiff's condition during the elimination period, the FCE deserves little weight.

Dr. Vlachos determined that even accounting for Plaintiff's subjective pain complaints, she could sit for up to 30 minutes at time for up to 6 hours per day, as well as stand and walk for 30 minutes at a time for up to 4 hours (each) per day. (311.) Mr. Jurado determined she could sit, stand, and walk for less than 30 minutes at a time for up to 3 hours per day. (708.) It was this severely diminished sit/stand/walk capacity that led Mr. Jurado to conclude that Plaintiff could not even perform part-time work.

Mr. Jurado's report is 38 pages long and contains dozens of strength and range of motion tests, which perhaps makes it look official and reliable. (708-745.) He gives specific measurements and discusses consistency on isometric testing in an attempt to lend scientific legitimacy to his opinions. (709-39.) The problem is that none of those measurements or tests inform Mr. Jurado's opinion on the critical activities: sitting, standing, and walking. Those measurements and tests inform his opinion on the other activities upon which he and Dr. Vlachos agree (reaching,

---

[7] If Plaintiff was not disabled when she left work, she lost coverage under the terms of the Group Policy. *See, e.g., Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1272 (10th Cir. 2002) (coverage terminates when participant leaves employment). Accordingly, even if Plaintiff could prove she became disabled at some later date (she cannot), she would not have been covered by the Group Policy and would thus not be entitled to benefits.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

lifting, etc.). Rather, Mr. Jurado based his opinion on nothing more than Plaintiff's own word.

> The client demonstrated limited sitting tolerance, being able to sit for 30 minutes on day 1 and 15 minutes continuously on day 2 until she had to stand up due to back pain. The client was able to stand for 45 minutes continuously on day 1 and for 15 minutes on day 2 until she had to sit due to lower back and left knee pain. The client ambulated more slowly and with a more guarded posture on day 2 of testing.

(710.)

That is why consistency in isometric measurements, even assuming it is otherwise a reliable validity indicator, is completely irrelevant to Mr. Jurado's opinion here.

Plaintiff also cites to "heart rate measurements" as evidence of validity. (Dkt. 18, at 17.) The FCE report does not contain heart rate measurements broken down by activity. Mr. Jurado simply says that on first day of testing, Plaintiff's "heart rate increased after functional activities consistent with performing maximal efforts" while Plaintiff "did not have a significant increase in heart rate after functional tasks on day 2 of testing." (709.) In other words, even if there was something to tie specific heart rate measurements to sitting, standing, and walking (there was not), Plaintiff would have actually ***failed*** that validity measurement because her heart rate did not increase to demonstrate effort on the second day.

The portion of the FCE upon which Plaintiff would like to rely—that she can only occasionally sit, stand, and walk—is not "objective and reliable" evidence like the FCEs in the cases she cites. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 770 (7th Cir. 2010)("FCE report included 20 different detailed tests" directed at the functional restrictions at issue); *Sangha v. Cigna Life Ins. Co. of New York*, 314 F. Supp. 3d 1027, 1037 (N.D. Cal. 2018) ("FCE contains numerous objective measurements of functional capacity."); *cf Caplan v. CNA Fin. Corp.*, 544 F.Supp.2d 984, 992 (N.D. Cal. 2008) (opinion does not describe the FCE and only mentions twice in passing, making it impossible to determine why that FCE was reliable.)

Nor is it compelling that Plaintiff's attorney sent Dr. Kohan a generic

9

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

questionnaire asking whether he agreed with the FCE. (334.) Dr. Kohan simply wrote "yes" that he agreed with the FCE conclusions without any elaboration as to why. (*Id.*) Dr. Kohan had never previously provided any functional restrictions for Plaintiff and made no attempt to justify such a stark departure from the opinion that she could work with mild restrictions that was repeatedly provided by his colleague, Dr. Haronian.

**E.   Plaintiff's Occupation Is Mostly Sedentary, But May Require Light-Duty Activities Such As Increased Walking Or Standing.**

Plaintiff incorrectly and incompletely characterizes her occupation as requiring "sitting, standing, walking, bending, and lifting up to 15 pounds, and as such, was performed at both sedentary and light exertional demand levels." (Dkt. 18, at 8.) As part of its thorough investigation, Lincoln obtained an occupational analysis. Plaintiff's occupation of an insurance agent could be performed as a sedentary or a light-duty occupation. (1156.) An outside sales agent position may be classified as a light-duty occupation because they "may be on their feet more than occasionally when meeting with customers, presenting and traveling to meetings." (1156.) Otherwise, the job is sedentary, requiring the claimant to "complete more work via computer, in person meetings, and telephone in an office setting." (*Id.*) Accordingly, the Substantial and Material Acts of Plaintiff's Own Occupation require that she be able to perform full-time office work, potentially allowing for more time standing or walking if she was meeting with clients. There is no support in the record for Plaintiff's occupation requiring light exertional demands (such as lifting 15 pounds or bending) beyond the additional standing and walking.

**III.   LINCOLN APPROPRIATELY GAVE SIGNIFICANT WEIGHT TO THE OPINIONS OF DRS. CHHATRE AND VLACHOS, WHO ARE BOTH QUALIFIED AND INDEPENDENT.**

Throughout her Trial Brief, Plaintiff attacks Lincoln for relying on a report from Dr. Chhatre and an IME from Dr. Vlachos, instead of deferring to the FCE by a

her non-physician hired expert. But Drs. Chhatre and Vlachos, unlike Plaintiff's providers, were retained through a third-party vendor and certified their independence.[8] And although IMEs are not required under ERISA, when an administrator obtains them, they are compelling evidence in assessing disability. *See, e.g.*, *Holden v. Blue Cross & Blue Shield of Texas, Inc.*, 2008 WL 4525403, at *31 (S.D. Tex. Sept. 30, 2008) (rejecting conclusions of FCE results when IME provider, independent medical reviewer, and treating physician all gave plaintiff functionality consistent with light or sedentary work); *Hawley v. Life Ins. Co. of N. Am.,* 2009 WL 10694819, at *11 (E.D. Cal. June 5, 2009) (IME was one piece of "compelling evidence that plaintiff is misstating or overstating his subjective complaints"); *Brannon v. BellSouth Telecommunications, Inc.*, 318 Fed. Appx. 767, 772–73 (11th Cir. 2009) (claim administrator properly weighed independent IME more heavily than unsupported treating physician opinion); The reports from Drs. Chhatre and Vlachos are compelling here.

### A.      The Attacks On Dr. Chhatre Are Baseless.

Plaintiff attempts to discredit Dr. Chhatre by saying he was not qualified to render an opinion because he is not an orthopedic surgeon. Furthermore, Plaintiff casts doubt on his independence by suggesting that his being licensed in multiple states might be because he only performs records reviews and does not actually treat patients. (Dkt. 18, at 13-14, 20.) Both critiques simply echo the criticism lodged by Dr. Haronian (whom Plaintiff hired to help her obtain workers compensation benefits). (133.) A simple review of Dr. Chhatre's report and a Google search would have served Plaintiff and Dr. Haronian well.

As Dr. Chhatre noted in his report, he is board-certified in physical medicine & rehabilitation ("PM&R") as well as a clinical educator for two Johns Hopkins fellowships: pain and spinal cord injury. According to Johns Hopkins, where

---

[8] Dr. Arora, also an independent physician not retained by Plaintiff or her attorneys, likewise determined that Plaintiff only had minimal functional restrictions.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

Dr. Chhatre is employed as "Director, Spine Rehabilitation Assistant Professor of Physical Medicine and Rehabilitation," Dr. Chhatre "sees and treats adults with a wide range of spinal diseases and disorders, including neck and low back pain, lumbar and cervical degenerative disease, scoliosis, spinal stenosis, facet joint disease, whiplash syndrome, sacroiliac and appendicular skeletal joint disease, and peripheral neuropathy."[9]

Moreover, Dr. Chhatre's bio largely explains the licensure in multiple states that Plaintiff and Dr. Haronian found suspicious: Maryland (where he currently practices at Johns Hopkins); Kansas (residency in PM&R); Pennsylvania (fellowship in interventional spine and sports); and Missouri (medical school).[10]

In case any doubt remains as to whether Dr. Chhatre is qualified to evaluate Plaintiff's medical records (none remains),[11] Dr. Chhatre puts it to rest. His report includes a certification that he "has the appropriate scope of licensure or certification that typically manages the medical condition, procedure, treatment, or issue under review and has current, relevant experience and/or knowledge to render a determination for the case under review." (904.)

Beyond that, courts have repeatedly found that PM&R doctors are appropriate medical specialties in various types of pain-based claims. PM&R doctors specialize in "the diagnosis and management of impairments of the musculoskeletal ... and other organ systems, and the long-term management of patients with disabling conditions." *Jacobson v. SLM Corp. Welfare Ben. Plan*, 2009 WL 2841086, at \*6 (S.D. Ind. Sept.

---

[9]   https://www.hopkinsmedicine.org/profiles/results/directory/profile/2875722/akhil-chhatre, viewed on 2/18/21.

[10] Dr. Chhatre is licensed in one additional state—Oklahoma—but Plaintiff has not provided any authority suggesting that a reviewing physician is biased because he is licensed in multiple states.

[11] Perhaps realizing her attacks on Dr. Chhatre's qualifications are futile, Plaintiff resorts to pointing out typos. Although Dr. Chhatre reviewed and considered the substance of Plaintiff's shoulder MRI, Plaintiff happily points out that he mistakenly said it was "undated." (Dkt. 18, at 20.) That small oversight does not undermine his opinion, which was based on the ***substance*** of the records. Indeed, Plaintiff's own brief mistakenly assigns her 10/5/16 MRI a date of 10/5/**18**. (Dkt. 18, at 15.) These are superficial issuesthat do not affect the claim analysis.

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

1, 2009) (PM&R reviewer was appropriate medical specialty to review fibromyalgia claim); *Sullivan v. Prudential Ins. Co. of Am.*, 2020 WL 6817327, at *4 (D. Ariz. Nov. 20, 2020) (PM&R physician was appropriate medical specialty to evaluate shoulder pain and cervical radiculitis, rejecting plaintiff's argument that an orthopedist was required). Notably, the Qualified Medical Examiner appointed by the State of California to evaluate Plaintiff—Dr. Arora—is also a PM&R physician. (410.)

**B.     Dr. Vlachos Performed A Thorough IME And Reached Conclusions That Were Supported By The Records And Even Accounted For Plaintiff's Subjective Complaints.**

Nor has Plaintiff provided any basis to discount the IME performed by Dr. Vlachos. As described in Lincoln's Trial Brief, Dr. Vlachos painstakingly reviewed Plaintiff's medical records, discussed Plaintiff's subjective complaints, and examined her to assess her functionality. (22-40.) Critically, Dr. Vlachos's restrictions and limitations expressly account for Plaintiff's subjective pain complaints. In determining that Plaintiff could sit for up to 30 minutes at a time, Dr. Vlachos cited to Plaintiff's "self-reported sitting tolerance [of] 30-45 minutes." (37.) Dr. Vlachos allowed for a restriction on the low end of Plaintiff's self-reported range, despite having observed Plaintiff sit for at least 45 minutes without "any outward displays of pain." (36.)

Similarly, based in part on Plaintiff's "self-reported standing limitation of 30-45 minutes," Dr. Vlachos provided a standing restriction of 30 minutes at a time with at least a 5-minute positional break. (37.)

When opining that Plaintiff could occasionally reach, Dr. Vlachos explained, "[t]he basis for this reaching restriction is based on her perceived shoulder pain" as well as the prior surgery and pre-surgery MRI. (37.) Likewise, in limiting upper extremity gripping, grasping, fingering, and feeling to "occasional," Dr. Vlachos specifically accounted for "her perceived limitations." (38.) Dr. Vlachos even added

"[i]t is my professional opinion that in describing these restrictions and limitations, it is important take into account the medical provider's restrictions and limitations, observations and examination findings of the claimant *as well as the claimant's perceived limitations*." (38 (emphasis added).) She went on to point out that her restrictions and limitations were in line with the restrictions and limitations provided by Dr. Haronian. (*Id.*)

Dr. Vlachos was obviously taking a conservative approach by crediting Plaintiff's self-reports, because she gave specific reasons that Plaintiff's "symptoms appeared to be out of proportion to what would be expected on the exam findings as well as imaging findings." (35.) Indeed, Dr. Vlachos included an entire paragraph on potential symptom magnification, noting positive Waddells' findings, tenderness to only light palpation, and inconsistent complaints on various mechanical tests. (*Id.*)

Moreover, Plaintiff's "upper extremity pain would not be consistent with the cervical MRI as there was no significant neural foraminal narrowing and the findings on cervical MRI appeared to be relatively minor." (*Id.*) Plaintiff's lumbar MRI showed only "an annular tear and degenerative changes which are commensurate with her age." (*Id.*) These mild findings do not explain the "significant limiting symptoms" Plaintiff reported. Dr. Vlachos aptly noted that Plaintiff "has been off work for over one year and she continues to have significant symptoms with no apparent improvement upon rest and not working." (*Id.*) Accordingly, even though Dr. Vlachos had good reason to discount Plaintiff's subjective complaints, she expressly incorporated them into her restrictions and limitations. Her IME is a conservative, measured, unbiased, and reliable piece of evidence concerning Plaintiff's functionality.

**C.    Dr. Vlachos Appropriately Offered A Medical Opinion, Not A Vocational Opinion.**

Plaintiff seizes on Dr. Vlachos's statement that Plaintiff could perform "some job within the restrictions." (Dkt. 18, at 23.) But Plaintiff is misguided in expecting

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

Dr. Vlachos to opine with vocational specificity as to what occupations Plaintiff could perform. Dr. Vlachos is an expert in medical conditions and functionality. Accordingly, she reviewed Plaintiff's medical records, examined Plaintiff, and then offered an opinion on Plaintiff's functionality. Lincoln then assessed whether Plaintiff could perform her occupation within that functionality. C.*f. Thompson v. Astrue*, 2012 WL 5989199, at *7 (W.D. Pa. Nov. 29, 2012)(treating physician's statement that SSDI claimant was "disabled" "amounted to nothing more than a legal conclusion"). The availability or unavailability of jobs consistent with a claimant's established abilities and limitations raises a vocational question rather than a medical question." (emphasis in original) (citations omitted)). Dr. Vlachos gave an opinion of Plaintiff's functionality squarely within her medical expertise. Her opinion is entitled to significant weight.

## IV.   IT IS APPROPRIATE FOR LINCOLN (AND THE INDEPENDENT PHYSICIANS) TO CORRELATE PLAINTIFF'S PAIN COMPLAINTS TO FINDINGS.

### A.   Collier's MRIs Do Not Prove Her Claim.

Plaintiff relies too heavily on her MRI findings. (Dkt. 18, at 14-15.) Even her hired expert, Mr. Jurado, seems to acknowledge that the MRI findings cannot explain Plaintiff's pain complaints. (62 ("MRI results of the cervical and lumbar spine do not provide a complete picture of a patient's symptoms . . . as it relates to the client's functional capacity.") Plaintiff's own appeal materials explain why abnormal MRI findings do not mean a claimant is functionally restricted. The Mayo Clinic article she submitted confirms that MRI:

> is the most sensitive test for detecting soft-tissue (eg, disk) abnormalities but is ***characterized by a high rate of abnormalities in asymptomatic individuals. The rates of abnormalities in people without symptoms varies from around 60% in individuals in their 40s to more than 80% in individuals older than 60 years***, with the most common abnormalities being decreased signal intensity and ***disk protrusions***.

(809 (emphasis added).)

15

Plaintiff, who was nearly 55 years old on her claimed date of disability, was rapidly approaching the age range where 80 percent of patients will have abnormalities (disk protrusions being among the most common) on their MRIs without having *any symptoms*. This is according to Plaintiff's own materials.

To be clear, this is not a case in which Plaintiff submitted multiple MRIs showing disease progression throughout her claim. Nor did she submit MRI findings that were consistent with the subjective complaints she raised. There are three MRI reports in the claim file, each of a different body part, two of the three pre-dating Plaintiff's claim:

| Date | Findings |
|---|---|
| 10/8/16 | Cervical Spine:<br>1. There is straightening of normal lordotic curvature, usually secondary to muscular spasm.<br>2. There is a 1 mm broad-based posterior disk bulge at C3-C4 level indenting the anterior aspect of the thecal sac.<br>3. There is a 2 mm central posterior disk protrusion at C4-C5 level causing pressure over the anterior aspect of the thecal sac.<br>4. There is a 2 mm broad-based posterior disk/endplate osteophyte complex at C5-C6 level causing pressure over the anterior aspect of the thecal sac.<br>5. There is a 2 mm broad-based posterior disk protrusion at C6-C7 level causing pressure over the anterior aspect of the thecal sac. There is mild narrowing of the left neural foramen and moderately significant narrowing of the right neural foramen. (502-03.) |
| 6/12/17 | Right Shoulder:<br>1. 9 mm AP approximately 50% partial-thickness articular surface supraspinatus tendon tear on a background of moderate tendinosis.<br>2. Infraspinatus and superior fiber subscapularis mild tendinosis.<br>3. Proximal long head of biceps mild tendinosis.<br>4. Minimal subacromial subdeltoid bursitis.<br>5. Acromioclavicular joint osteoarthrosis. (507.) |
| 2/15/19 | Lumbar Spine:<br>1. Anterior osteophytes at T12 down through L5.<br>2. Mild disc desiccation at L2-L3 down through L5-S1. Associated loss of disc height is seen at L5-S1.<br>3. There is no significant disc herniation or neural foraminal narrowing visualized. The spinal canal is patent. No significant neural foraminal narrowing. Exiting nerve roots are normal. Left lateral annular fissure is identified.<br>4. There is no significant disc herniation or neural foraminal narrowing visualized. The spinal canal is patent. No significant neural foraminal narrowing. Exiting nerve roots are normal. Left lateral annular fissure is identified.<br>5. A mild disc bulge is identified. Disc material abuts the thecal sac. The spinal canal is patent. No significant neural foraminal narrowing. Exiting nerve roots are normal. Central posterior annular fissure is identified. Disc deformity measures 2.6 mm. (500.) |

These isolated snapshots of Plaintiff's cervical spine in 2016, right shoulder in

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

2017, and lumbar spine in 2019, do not explain Plaintiff's escalating subjective complaints. Consistent with the Mayo Clinic article Plaintiff submitted on appeal, her cervical spine MRI revealed abnormalities, but those abnormalities did not correlate with symptoms sufficient to preclude Plaintiff from performing her own occupation. Indeed, her performance reviews for 2016 reflect that she was performing her job well despite the MRI findings. (776 (the office's top auto and home producer), (780 "top producer for auto, home, membership, boat and PUP for the Santa Clarita office. every month her goal and focus is all lines achievement. she is self motivated and works hard daily").

Plaintiff, then cannot use MRI abnormalities from 2016 to prove she was disabled from May through November 2018 (her elimination period). Similarly, the 2017 shoulder MRI was taken while she was still working and that shoulder was subsequently repaired surgically (months before she would claim disability), rendering this MRI particularly unhelpful in supporting her claim. Finally, the 2019 lumbar MRI occurred more than three months after her elimination period ended, so doesn't discuss her condition during the elimination period. Beyond that, the findings are mild, with no indication that her nerves or spinal cord are being impinged.

## B.    Plaintiff's Workers Compensation Findings Do Not Prove Her Claim.

The timeline set forth in Lincoln's Opening Brief demonstrates that Plaintiff's claim began as a workers compensation claim and only became an ERISA LTD claim as an afterthought. She retained physicians specifically focused on supporting her workers compensation claim and did not even notify Lincoln of this claim until 9 months after she left work. Accordingly, Plaintiff's medical records contain impairment findings under workers compensation standards. Those findings do not satisfy the Group Policy's proof requirement.

*Workers' compensation definitions of disability are not binding on ERISA plans*. Were the contrary the case, employers might be reluctant to place their pension funds at risk of being put in financial straits as a result of shifting attitudes of state workers' compensation

17

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

administrators, contrary to the intent of Congress. Moreover, differences from state to state would adversely affect interstate businesses seeking to apply uniform standards to all employees for the purpose of promoting good labor employer-employee relations.

*Pagan v. Nynex Pension Plan*, 846 F. Supp. 19, 20–21 (S.D.N.Y. 1994), aff'd, 52 F.3d 438 (2d Cir. 1995) (internal citations omitted) (emphasis added).

First, Dr. Haronian—expressly hired to support the workers compensation claim—did not find significant "whole person impairment." (925-26 (finding between 1 and 8% whole person impairment for multiple body parts).)[12] And comparing his opinion to the AMA Guidelines that he used demonstrates that his opinion was wholly based on subjective pain complaints and subjective range of motion measurements. For instance, Dr. Haronian gave Plaintiff an 8% whole person impairment for her cervical spine complaints, citing to Table 15-5 in the AMA Guidelines. (925.) According to Table 15-5, an 8% impairment is appropriate under workers compensation standards based on subjective testing such as "muscle guarding . . . loss of range of motion or ***nonverifiable radicular complaints***, defined as complaints of radicular pain ***without objective findings***." (Holmstrom Decl., Ex. 1, at 392 (emphasis added).) Indeed, Dr. Haronian specifically noted that Plaintiff "does describe ***non-verifiable*** radicular complaints." (925 (emphasis added).)

Similarly, Dr. Haronian assigned 6% and 5% impairment ratings for Plaintiff's left and right shoulders, respectively, citing to Figures 16-40, 16-43, and 16-46 in the AMA Guidelines. (925.) Those figures reveal that the impairment rating is wholly dependent on subjective range of motion testing. (Holmstrom Decl., Ex. 1, at 476, 477, 479.) Because Plaintiff demonstrated no consistency in her range of motion testing, under the workers compensation framework, her impairment rating would have varied wildly, including warranting a 0% impairment for both shoulders based on Dr. Kohan's completely normal December 13, 2018 range of motion testing. (Dkt.

_____

[12] Dr. Arora, even applying workers compensation standards, found a much lower whole person impairment. (380-81.)

19-1.) The Group Policy and ERISA require Plaintiff to do more than recite subjective complaints. (Dkt. 19, at 19-20.) The workers compensation scheme does not, rendering those impairment ratings meaningless in this ERISA case.

### C.    A Diagnosis Does Not Prove A Disability.

Plaintiff's "objective" evidence, at best, shows that she has some degenerative changes to her spine and had some pre-surgical findings on her right shoulder.[13] Her doctors have also reported wide-ranging results on range of motion testing. (Dkt. 19-1.) This does not satisfy her burden of proving disability. As the Ninth Circuit explained: "That a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working… Sometimes [peoples'] medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 370 ,880 (9th Cir. 2004); *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability. A claimant bears the burden of proving that an impairment is disabling."); *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1100 (C.D. Cal. 2009), *aff'd, Seleine v. Fluor Corp. Long-Term Disability Plan*, 409 Fed. Appx. 99 (9th Cir. 2010) ("The focus of the [disability] analysis is on the degree to which the physical impairment has hindered a worker's earning capacity.").

Plaintiff thus did not satisfy her burden of proof by submitting the MRI findings. She needed something more to correlate those relatively unremarkable findings to the extreme symptoms she reported (and that Mr. Jurado adopted uncritically). She failed to produce that necessary evidence. To the contrary, her performance reviews demonstrate Plaintiff was performing her occupation well for

---

[13] Plaintiff suggests that her claim has a carpal tunnel component. (Dkt. 18, at 10-11.) But Plaintiff did not submit any radiographic or nerve conduction studies.

Case No. 8:20-cv-00839-JVS-KES
DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

years despite having degenerative changes.

## V. PLAINTIFF HAS NO EVIDENCE TO SUPPORT HER LITIGATION ARGUMENT THAT HER MEDICATIONS DISABLED HER.

Scrambling to find some basis for functional impairment, Plaintiff argues "the side effects of narcotic medications such as Norco and gabapentin would have impacted her ability to perform the detailed work required of her occupation." (Dkt. 18, at 15.) To support this argument, Plaintiff cites to *Utter v. UNUM Life Ins. Co. of America*, 404 F. Supp. 2d 1204 (C.D. Cal. 2005). Plaintiff cannot wedge her own claim into the *Utter* analysis where there is not a single medical record and not a single note from any provider indicating that Plaintiff's medications cause impairing side effects.

### A. Plaintiff's Doctors Never Offered Any Opinion That Plaintiff Was Impaired By Her Medication.

As noted in the Table on page 3, above, a number of physicians examined Plaintiff during the elimination period and provided mild restrictions and limitations. None of those physicians ever mentioned that Plaintiff was impaired by her medications. To ensure it had a full picture of Plaintiff's functionality, Lincoln directly asked Dr. Chhatre whether "the medical evidence support[ed] any side effets from the prescribed medications." (903.) Dr. Chhatre unequivocally responded "There is no medical evidence to support impairments related to prescribed medications." (*Id.*) Plaintiff had Dr. Chhatre's report when she retained counsel and submitted her appeal; but the appeal letter does not mention medication side-effects. (850-55.) And although Plaintiff had been seeing Dr. Kohan for pain management for several months and despite the fact that he provided a statement in support of her appeal, Plaintiff offered nothing from Dr. Kohan to support potential impairment from her medication. (334 (discussing only physical impairments).) Not even the FCE provider retained by her attorneys provided any restrictions or limitations relating to her medications (the report is silent as to any medication side effects).

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

(707-44.)

On appeal, Lincoln specifically asked Dr. Vlachos, the independent IME provider, whether "the medical evidence support[ed] any side effects from the prescribed medication." (312.) Dr. Vlachos confirmed that "the medical records do not support any impairment or side effects from any medication." (312.)

Lincoln provided Plaintiff's counsel with Dr. Vlachos's IME report and gave Plaintiff a chance to respond. (257.) Plaintiff's counsel did not provide any response to the IME from Drs. Haronian, Kohan, or Tun. (244-45.) Mr. Jurado attempted to rebut some portions of the IME, but never mentioned medications. (62-63.) And although Plaintiff obtained additional records from Drs. Kohan and Haronian, including multiple comprehensive reports from Dr. Haronian, neither provided any restrictions or limitations relating to Plaintiff's medications. (88-220.) Plaintiff cannot prove that she had any impairment from her medications; none of the providers who saw her supported functional impairment and Drs. Chhatre and Vlachos found support similarly lacking.

**B.    Plaintiff Has A Long History Of Being Able To Work While On Her Medications.**

Once again, Plaintiff's own evidence belies her claims of impairment. She has been taking Norco since January 2016 and Gabapentin[14] since February 2017. (110, 115, 117 (Norco prescribed on 1/26/16, 1/17/17, and 7/10/17); 116, 372, 374 (Gabapentin prescribed on 2/16/17, 3/2/17, and 11/30/17).) If, as Plaintiff claims, the medications caused her such severe side effects that she could not perform her occupation, you would expect that her job performance would have suffered. But, as described in Section IV.A, above, Plaintiff's performance reviews were positive. In

---

[14] To bolster her claim, Plaintiff calls Gabapentin a narcotic. It is not. *Gevas v. Shearing*, 2016 WL 1221937, at *7 (S.D. Ill. Mar. 29, 2016) ("[Gabapentin] is not a painkiller in the traditional sense of the word, meaning it is not a narcotic or opioid pain reliever . . . It is not even a controlled substance."); *see also* https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf (listing of DEA controlled substances, Gabapentin/Neurontin is not on it).

2016, the year she began taking 5 mg Norco tablets, Plaintiff was lauded for her 96.92% accuracy, which only improved (to 98.91%) in 2017 when she added Gabapentin to her regimen. (777, 791.) Plaintiff demonstrated that she was able to excel at her occupation while taking the medications she now claims are disabling.

C.    **Plaintiff's Medications Remained Consistent During Her Claim And The Records Show She Had No Side Effects That Impaired Functionality.**

Plaintiff saw Dr. Tun on May 14, 2018, the day she left work. Over the prior two years, she had been prescribed 5 mg of Norco. (110, 115, 117.) Dr. Tun kept that consistent, prescribing her a half tablet of 10 mg Norco. (119-20.) He also prescribed her Gabapentin, stepping up from 100 mg to 300 mg (all taken at bedtime) over three weeks. (1123.) By her July 6, 2018 visit with Dr. Tun, she had stopped taking her pain medication. (1113.) When Plaintiff initially began treating with Dr. Haronian, she was still not taking any medications. (959.) Plaintiff obtained a one-time prescriptions of 5 mg Norco from Kaiser when she elected to defer surgery on her right shoulder on November 12, 2018. (1069-70.) Accordingly, for the bulk of her elimination period (from at least July through November 2018), Plaintiff was not taking any pain medication at all. Her pain medication thus cannot meet her burden of proving she was disabled through the elimination period.

But her medication argument falls flat even looking beyond the elimination period. Dr. Haronian continued Plaintiff on 5 mg of Norco at her November 28, 2018 visit. (946.) When Plaintiff initially met with Dr. Kohan for pain management, Plaintiff reported to him that she had been taking a single 5 mg Norco tablet at the end of active days. (942.) Dr. Kohan continued the 5 mg Norco prescription on January 3, 2019, but only if she kept it to one tablet per day. (931.) Similarly, on March 3, 2019, Dr. Kohan continued her on 5 mg of Norco, maximum of one per day. (912.) During this time, Plaintiff's Gabapentin was consistently at a 300 mg dose. (*see, e.g.*, 912, 931.)

Drs. Haronian and Kohan continuously monitored Plaintiff for medication side effects and found none. On February 25, 2019, Dr. Kohan specifically observed "[s]he does not report any side effects with Norco 5 mg, Neurontin 300 mg and this include no nausea, vomiting, constipation, oversedation, or epigastric pain." (911-12.) He found "no sign of sedation" and concluded "[f]or now, her complaints are under control with the current regimen with no interference." (*Id.*) Dr. Haronian confirmed this at the September 5, 2019 visit, noting "She is tolerating medications well" with "no signs of sedation." (99.) On January 6, 2020, Dr. Kohan recorded "[w]ith the regimen, there are no side effects." (88.)

Plaintiff now claims in litigation that her medications functionally impaired her, but this is not supported by the medical records, her providers' opinions, or her long history of performing her occupation while taking those medications.

## VI.     PLAINTIFF CANNOT OBTAIN "ANY OCCUPATION" BENEFITS IN THIS LAWSUIT.

Plaintiff asks the Court to not only award her 12 months of "own occupation" benefits, but also to award her benefits into the "any occupation" period, which commenced in November 2019. Her entire factual basis for this request is that Dr. Vlachos's "IME [which was performed in the any occupation period] revealed numerous limitations that would preclude any sedentary job . . . such as Plaintiff's own occupation, demonstrating that she cannot engage in any sedentary occupation." Dkt. 18, at 25. She cites to literally nothing for that bold assertion. There is nothing to cite; Dr. Vlachos clearly opined that Plaintiff could work full time within certain restrictions and limitations. (*See* Section III.B, above.) Lincoln correctly determined Plaintiff could perform her occupation within those limitations. There is no possible way to interpret Dr. Vlachos's report as finding that Plaintiff could not perform any other occupation. Nor is it possible to interpret Dr. Haronian's restrictions in that manner (which predate the any occupation period,[15] but are instructive on this point).

---

[15] Plaintiff did submit two office visit notes from Dr. Kohan during the appeal that

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

Rather, this untenable argument is Plaintiff's attempt to shoehorn her claim into a case she likes: *Tam v. First Unum Life Ins. Co.*, 2020 WL 5904804, at *10 (C.D. Cal. Sept. 30, 2020). Plaintiff cites to a portion of *Tam* that does not make sense, even under the facts of that case. The court awarded benefits into the "any occupation" period because "in denying benefits and determining that Tam could perform her regular occupation, [the claim administrator] necessarily determined that she could do other, less demanding jobs." *Id.* at *10. While that may be true, it does not necessarily follow that the administrator ***wrongly*** decided she could perform less demanding jobs. It thus does not follow that "any occupation" benefits were appropriate.

Not surprisingly, the case is currently on appeal. In any event, *Tam* is factually distinct. Unlike Plaintiff, the *Tam* claimant had multiple physicians opine that she could not work at all. *Id.* at *7-*9. Here, Plaintiff's own treating physician—Dr. Haronian (the only treating physician to provide restrictions beyond the elimination period)—said she could work with mild, reasonable restrictions. Plaintiff has not even come close to proving she is entitled to "any occupation" benefits.

## VII.   CONCLUSION.

Plaintiff failed to prove her claim. Lincoln's fiduciary duties thus preclude it from paying the claim. Plaintiff's subjective complaints cannot overcome the strong evidence from multiple sources that she can perform her occupation. The Court should uphold Lincoln's decision.

---

fall in the "any occupation" period, but neither of them provide any restrictions or limitations that would preclude Plaintiff from even her own occupation. (88-92.)

24

Case No. 8:20-cv-00839-JVS-KES

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF

DATED: March 18, 2021                    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ Jenny H. Wang
    Jenny H. Wang
    Kristina N. Holmstrom
    Attorneys for Defendant
    LINCOLN LIFE ASSURANCE
    COMPANY OF BOSTON

46400271.2

DEFENDANT LINCOLN LIFE ASSURANCE COMPANY OF BOSTON'S RESPONSE BRIEF