Jenny H. Wang CA Bar No. 191643
jenny.wang@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:   714-800-7900
Facsimile:   714-754-1298

Kristina N. Holmstrom, AZ Bar No. 023384 (Admitted Pro Hac Vice)
kristina.holmstrom@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Esplanade Center III
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: 602-778-3724
Fax: 602-778-3750

Attorneys for Defendant
LINCOLN LIFE ASSURANCE COMPANY OF BOSTON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI COLLIER<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN LIFE ASSURANCE COMPANY OF BOSTON<br><br>Defendant. | Case No. 8:20-cv-00839-JVS-KES<br><br>**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Complaint Filed: May 1, 2020<br>District Judge:    Hon. James V. Selna<br>Magistrate Judge:Hon. Karen E. Scott<br>Trial Date:  February 22, 2021, 3:00 pm |

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Lincoln Life Assurance Company of Boston submits the following Proposed Findings of Fact and Conclusions of Law pursuant to the Court's Order at Docket # 21:

After consideration of the parties' respective Opening and Responding Trial Briefs and the oral argument of counsel provided during the March 29, 2021 bench trial, the Court determines that the following facts have been established in this action:

## FINDINGS OF FACT

### Pertinent Policy Provisions

1. In this action, Plaintiff Vicki Collier ("Plaintiff") claims entitlement to long-term disability ("LTD") benefits under an employee welfare benefit plan (the "Plan") sponsored by her former employer, AAA.

2. Lincoln issued group disability income policy number GF3-860-444185-01 (the "Group Policy") to AAA, which funds LTD benefits under the Plan. (1217.)

3. The Plan and Plaintiff's claim for benefits thereunder are governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. Section 1001 et seq. ("ERISA").

4. The Group Policy contains a 12-month, own occupation definition of "Disability":

> [D]uring the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way; and thereafter, the Covered Person is unable to perform with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engaged with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity.

(1225.)

5. "'Substantial and Material Acts' means acts that are normally required for the performance of the Covered Person's Own Occupation and ***cannot be***

*reasonably omitted or modified*." (1228 (emphasis added).)

6. The Group Policy requires Plaintiff to submit proof of disability on an ongoing basis in order to qualify for benefits, as demonstrated by the following provisions:

- "Written proof of loss must be furnished to the insurer." (1256.)
- "'Proof' means written proof covering the occurrence, the character and the extent of the loss for which the claim is made." (1231.)
- "When [Lincoln] *receives Proof that a Covered Person is Disabled* due to Injury or Sickness, [Lincoln] will pay the Covered Person a Monthly Benefit." (1239.)
- "*Subject to due written proof* . . . Long Term Disability benefits will be paid Monthly." (1256.)

7. Plaintiff's Elimination Period was from May 15, 2018 (the first day she stopped working) to November 15, 2018 (the date her STD benefits ended). (1221.)

8. To receive benefits, then, Plaintiff had to prove that she was continuously disabled during the entire Elimination Period, (continuously from May 15, 2018 to November 15, 2018) and beyond.

**Plaintiff's Claim For Benefits**

9. Plaintiff worked for AAA as an insurance sales agent, a sedentary to light duty occupation. (1155-57.)

10. Plaintiff performed her occupation despite shoulder pain for years before having right shoulder rotator cuff surgery on July 25, 2017, returning to work thereafter. (956-57.)

11. Despite a successful recovery, she stopped working on May 14, 2018, claiming work-related repetitive use injuries: shoulder, neck, arm and wrist pain with right-sided numbness, tingling and weakness. (989, 996-98.)

12. On May 10, 2018, Plaintiff visited her internal medicine physician, Dr. Patrick Anthony. (1126-27.) She did not mention her disabling conditions. Rather, she complained only about ringing in ears and said nothing about orthopedic pain. (*Id.*)

13. On the day she left work, May 14, 2018, Plaintiff saw her orthopedist,

5

Dr. Tun. (1118.) Her chief complaint was persistent pain in bilateral shoulders. (1118.)

14. Dr. Tun's examination revealed that Plaintiff had no muscle atrophy and her shoulder joint had 90 degrees of forward flexion and adduction, as well as external rotation of 70 degrees and 20 degrees of internal rotation. (1119.)

15. Plaintiff told Dr. Tun that she "[w]ill be stopping her current job" and there is no indication that Dr. Tun initiated any conversation about Plaintiff leaving work. (1119.)

16. Dr. Tun completed a work status report indicating that Plaintiff should be placed on modified work activity for two months (through July 15) with restrictions of "No typing. No use of both shoulders and arms." (1125.) Dr. Tun did not recommend further treatment other than providing her with an anti-inflammatory as well as pain medication and telling her to follow up as needed. (1119.)

17. Plaintiff did not see Dr. Tun again until July 6. (1113.) She had stopped pain medications and was doing physical therapy at Henry Mayo. (*Id.*)

18. Dr. Tun administered cortisone injections and, again, told Plaintiff to follow up as needed. (*Id.*) Although, Dr. Tun renewed the prescription for the anti-inflammatory, he did not prescribe any pain medication. (1113.) Finally, Dr. Tun extended the work restrictions for approximately a month and a half, reporting that Plaintiff could "return to work at full capacity on 9/1/18." (1117.)

19. On August 27, 2018—four days before Dr. Tun had cleared her to return to work at full capacity—Plaintiff had a telephone appointment in which she asked Dr. Tun to extend her work restrictions. (1089.) She told Dr. Tun she was experiencing shoulder "pain with prolonged activity." (1089.) Dr. Tun ordered a diagnostic MRI of the right shoulder and—per Plaintiff's request—extended her work modifications, saying she could return to work at full capacity on November 1, 2018 (two weeks before her Elimination Period expired).

20. Although Dr. Tun offered a surgical option, Plaintiff declined. (1089.)

Case No. 8:20-cv-00839-JVS-KES
[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

There is no indication that Plaintiff ever treated with Dr. Tun again.

21. Instead of following through with Dr. Tun, on September 5, 2018 (four months after leaving work), Plaintiff established care with Dr. Haronian (orthopedic surgeon) with an eye toward supporting a workers compensation claim. (956-67.)

22. Dr. Haronian opined "*she may return to the workplace*, but should not lift, push, or pull more than 10 pounds. She should not perform bending, twisting activities, or place the spine in unusual or awkward positions. She should not perform repetitive hand motions, pinching or grasping bilaterally." (965 (emphasis added).)

23. On October 10, Dr. Haronian again documented ongoing complaints of radiating neck and back pain, he refilled pain medications, and stated, "Her current work restrictions will continue." (952-53.)

24. On October 11, 2018, Dr. Ripu Arora performed a Qualified Medical Examination ("QME") on Plaintiff in connection with her workers' compensation appeal. (410-22.)

25. Dr. Arora had Plaintiff fill out a number of forms about her symptoms and activities. One of the forms asked Plaintiff to rate, on a scale of 0-10, how much her pain interferes with her "ability to write or type." (418.) Plaintiff initially circled zero, then crossed it out and circled 2-3, adding that the interference increased to 10 if she had to sit for a long time while working. (418.) When asked to rate how much her pain affected her ability to walk a block or lift 10 pounds, Plaintiff circled 1. (417.) On a different form, however, Plaintiff reported that she could only walk "with much difficulty" and declined to answer questions about her ability to lift various weights. (414.)

26. Plaintiff told Dr. Arora that her claim was for "pain in her neck, shoulder, and lower extremities, hemorrhoids — internal and external, headaches, forearm, elbows, and shoulder blade pain and upper back pain because of the lack of the ergonomic furniture provided to her at the work location." (411.)

27. Under "present complaints," however, Dr. Arora did not record any

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

information about claimed shoulder symptoms. (413.) Instead, Plaintiff reported lower back pain during a recent 3-4 hour car trip and 4-hour flight to Chicago (much longer than she reported being able to sit). (413.) She also described achiness and stabbing pain in her upper arms as well as in her lower back and lower extremities. (413.)

28.     Plaintiff did not report pain in her hands/wrists or from using her hands/wrists. (410-22.) Her migraines and hemorrhoids had resolved. (413.) Dr. Arora performed bilateral shoulder examinations, but did not remark on any abnormalities. (420.)

29.     Because Dr, Arora did not have access to Plaintiff's medical records at that time, he was unable to make a determination as to whether her claimed injuries were work-related, whether her condition was permanent and stationary, or whether Plaintiff had any permanent impairment. (421.)

30.     On October 24, 2018, Dr. Arora reported, "Now I have received her medical records [from 2002 to 2018] and there are a lot of differences between her history provided to me at the time of the October 11th examination and the medical records provided to me." (378-79)

31.     For example, Dr. Arora reported that Plaintiff told him she injured her neck and left shoulder in 2016 in Mexico, but her medical records showed that she first complained of shoulder pain on March 27, 2015 to her internist and that she complained of neck pain long before her 2016 Mexico trip, going back to 2007. (379)

32.     Dr. Arora opined that Plaintiff's back and neck pain were not employment-related but that her right shoulder pain was related to employment. (380.) Plaintiff's right shoulder had been permanent and stationary since October 31, 2017, well before leaving work for this claim (indicating that it did not prevent her from performing her occupation). (*Id.*)

33.     Similarly, Plaintiff's neck and low back complaints pre-existed her employment and were thus not work-related (again, demonstrating she was able to

8

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

perform her occupation with those complaints). Dr. Arora stated that Plaintiff should avoid any heavy lifting more than 20 lbs. and avoid reaching above head. (381)

34.     Dr. Arora did not give any further restrictions or limitations, including any relating to sitting tolerance or hand usage. Regarding future treatment, he stated that Plaintiff might need physical therapy for her shoulder for the next 12 months. (*Id.*) According to Dr. Arora, Plaintiff had a 9 percent whole person impairment, 4 percent of which was attributable to shoulder complaints. (407-08.)

35.     Plaintiff had two appointments back at Kaiser on October 16, 2018 (for Botox injections) and November 12, 2018 (supposed to be a post-op visit for shoulder surgery that Plaintiff canceled due to being out of state for family issues). (1068-70.) At both visits, Plaintiff admitted exercising for 6 hours per week "at a moderate to strenuous level." (1070, 1080.)

36.     Plaintiff next saw Dr. Haronian (who did not yet have the QME report to go over MRIs of her cervical spine and right shoulder) on November 14. (588) Dr. Haronian did not update his work restrictions, meaning that he still felt Plaintiff could return to work with slight modifications. (588)

37.     On November 29, 2018, Dr. Haronian signed a "Primary Physician Progress Report" indicating that Norco, a pain medication, had reduced Plaintiff's pain by at least 30-40%. (591) Plaintiff "note[d] improved functional capacity with activities of daily living, self-grooming, and chores around the house. There are no significant adverse side effects" (592) Dr. Haronian did not amend his prior work restrictions. (592)

38.     In November 2018, Dr. Haronian also referred Plaintiff to his pain management colleague, Dr. Jonathan Kohan. (946) Dr. Kohan saw Plaintiff for the first time on December 13, 2018 and performed a physical examination, in which Plaintiff demonstrated normal range of motion in the cervical spine and shoulders, normal reflexes and normal motor strength in the upper extremities. (940-42.) Dr. Kohan did not provide any restrictions or limitations.

9

39.    In a follow-up visit note dated January 28, 2019, Dr. Kohan stated that he reviewed Dr. Arora's QME and acknowledged the many inconsistencies between Plaintiff's reported complaints and what Dr. Arora saw in her records. (929) However, Dr. Kohan disagreed that Plaintiff's neck, shoulder, and low back complaints were not work-related. (930) Dr. Kohan did not impose restrictions and limitations or critique Dr. Arora's mild restrictions. (929-30.)

40.    Dr. Haronian saw Plaintiff again on January 31, 2019 and issued another report in connection with Plaintiff's workers compensation claim, entitled "Permanent and Stationary Report of a Primary Treating Physician." (917) He concluded that Plaintiff's injuries to her cervical and lumbar spine, shoulders, elbows and wrists were work-related and that Plaintiff had reached permanent and stationary status. (924-25) He identified the following "work restrictions": no extended upward or downward gazing; no repetitive bending and twisting of the lumbar spine; no repetitive activities at or above the shoulder level; no repetitive torqueing; no repetitive power gripping, repetitive keying, repetitive grasping or repetitive pinching. (924.) Dr. Haronian concluded, "The patient *can return to work* with the restrictions that have been provided." (924) (Emphasis added.)

41.    Plaintiff submitted her LTD claim to Lincoln in February 2019, nine months after she stopped working. (10.)

42.    Lincoln assigned Cara Campbell, Disability Case Manager, to initially handle the claim. Within a couple days, on February 19, Ms. Campbell called and spoke with Plaintiff about her claim. (10.)  Plaintiff informed Ms. Campbell that she had a desk job with AAA that did not include travel. She stopped working due to shoulder pain and had right shoulder rotator cuff surgery on July 25, 2017. (*Id.*) She returned to work after the surgery but stopped working in May 2018, purportedly due to continued pain in the right and now the left shoulder. (*Id.*)

43.    Plaintiff's workers' compensation claim was on appeal following denial. She stated that she was treating with Dr. Haronian, and also with physicians at

10

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Kaiser. (*Id.*) Plaintiff conceded that Dr. Haronian's restrictions of not to reaching overhead or lifting above a certain weight did not impact her occupation. (*Id.*) Rather, she claimed pain with repetitive motion (which is inconsistent with the forms she filled out for Dr. Arora in which she made it clear that sitting was the primary cause of her pain). (*Id.*; 417-18.)

44.    Dr. Kohan saw Plaintiff for a follow-up visit on February 25, 2019 for medication management. (911) He noted that she did not report any side effects from her pain medications and that "For now, her complaints are under control with the current regimen with no interference." (912)

45.    Lincoln obtained Plaintiff's medical records, as summarized above. Kristie Larocca, Disability Case Manager, then took over the handling of this claim in late February 2019. (9.) Ms. Larocca obtained an Occupational Analysis from Jane G. Howard, Senior Vocational Rehabilitation Consultant, who opined that Plaintiff's occupation was performed at sedentary to light physical demand categories in the national economy. (1155-57.)

46.    On March 5, 2019, Plaintiff informed Ms. Larocca that Dr. Haronian was the physician keeping her out of work. (8.)

47.    Synapse, the clinic at which Drs. Haronian and Kohan practice, had not yet provided information to Lincoln. Ms. Larocca informed Plaintiff that "it [was] important to obtain those records." (8.) Ms. Larocca then spent the remainder of March and much of April 2019 attempting to obtain the Synapse records only to be told by Plaintiff that Synapse required a subpoena. (6-8.) Plaintiff finally obtained and mailed the Synapse records to Lincoln in late April.

48.    Upon receiving the Synapse records, Ms. Larocca referred all of Plaintiff's medical records[1] to a third party, NMR, for a review. NMR chose Akhil Chhatre, M.D. (physical medicine and rehabilitation), who provided a report dated May 8, 2019. (900)

---

[1] At that time, Lincoln did not yet have Dr. Arora's reports.

49.    Dr. Chhatre observed that Plaintiff's medical records, including MRIs of the cervical spine and right shoulder, showed stable exam findings with no new diagnostic testing or exam changes to suggest an acute neurologic or musculoskeletal derangement. (903.)  The severity and scope of Plaintiff's reported pain were not in line with her stable cervical, lumbar and shoulder conditions. (*Id.*) To get a better understanding of the treating physicians' opinions, Dr. Chhatre called and left four messages asking for a call back from Drs. Haronian and Kohan, and they did not return his calls. (901.)

50.    After a thorough review, Dr. Chhatre opined that Plaintiff could work full-time (8 hours/day, 5 days/week) without restrictions. (903.)

51.    After a complete review of all the information in the file, Ms. Larocca determined that Plaintiff failed to meet her burden.  Her supervisor, Brian Cram, agreed. (6.) Ms. Larocca sent a letter dated May 9, 2019, informing Plaintiff that she failed to provide written proof that she was disabled, as required by the Group Policy and advising her of her appeal rights. (894-98.)

**Plaintiff's Appeal**

52.    In July 2019, Plaintiff retained counsel, Glenn Kantor, who notified Lincoln of Plaintiff's intent to appeal the claim determination. (872.) Then, in October 2019, Mr. Kantor submitted additional information, including updated medical records. (850-55.) None of the new medical records spoke to treatment during the critical Elimination Period (May through November 2018).

53.    Mr. Kantor included advocacy statements from Plaintiff's domestic partner, her daughter and Plaintiff. Mr. Kantor included a statement by Dr. Haronian signed on October 1, 2019, responding to Dr. Chhatre's report. (331) Dr. Haronian stated that based on his range of motion measurements and Plaintiff's reported back and neck pain, he believed Plaintiff "will not be able to perform her previous work activities as indicated in my January 31, 2019 report". (330)

54.    To support the appeal, Mr. Kantor also retained Sebastian Jurado to

12

perform a functional capacity examination ("FCE"). (707). Attorney Kantor predictably hand-picked Sebastian Jurado to perform a functional capacity examination ("FCE"). (707)

55.     Mr. Jurado saw Plaintiff on September 12 and 13, 2019 and had her perform various physical activities to her self-reported capacity. In other words, Plaintiff stopped each activity when she told Mr. Jurado she could do no more and said she had increased pain. Mr. Jurado stated that these test results demonstrated less capacity on day 2 as compared to day 1 of testing. (709.) As a result, he opined that Plaintiff was unable to perform sustained full or part-time work. (708)

56.     Lincoln assigned Kimberly Murray, Appeals Consultant, to handle Plaintiff's appeal. (4.) Ms. Murray referred the file to a third party, ECN, for an Independent Medical Examination. ECN chose Stuart Rubin, M.D. (physical medicine and rehabilitation) in Los Angeles and scheduled the IME for December 20, 2019. (321.)

57.     The IME was delayed, however, because Plaintiff's counsel asked Ms. Murray to reschedule, claiming Plaintiff was unavailable on that date. (319.) Counsel also requested an examiner closer to Valencia, California. (*Id.*) Ms. Murray accommodated counsel's request and contacted another vendor, NMR, to select another IME physician. (315.) NMR chose Katrina M. Vlachos, M.D. (physical medicine and rehabilitation). (*Id.*)

58.     Dr. Vlachos examined Plaintiff on January 27, 2020. (296) Dr. Vlachos concluded that Plaintiff's reported pain was out of proportion to what was expected, based on her examination, her review of Plaintiff's records, including cervical, shoulder and lumbar MRI's, and 20 years of examining patients in an orthopedic nonsurgical specialty. (309-10.)

59.     Dr. Vlachos noted that Plaintiff complained of the same or worsening work-related repetitive use symptoms despite not having worked for almost two years. (309.) Dr. Vlachos noted that Plaintiff had good range of motion in the

Case No. 8:20-cv-00839-JVS-KES
[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

cervical/lumbar spine, as well as intact strength and minimal loss of sensation in the upper and lower extremities. (309-10.) She noted that Plaintiff was working out and exercising on a daily basis. (*Id.*) Indeed, Plaintiff informed Dr. Vlachos that her activities included daily exercise, walking, stretching, taking classes at the gym and biking. (306.)

60.    Dr. Vlachos also noted that Plaintiff had positive Waddell's signs which, when combined with the number of symptoms that were out of proportion to the imaging studies, led her to conclude "there are likely some nonorganic contributions to the claimant's symptoms." (309-10.) "Based on the claimant's examination and functional activities, the claimant appeared to be capable of more activity and she tends to underestimate her functional capabilities." (310.)

61.    Dr. Vlachos opined that with certain restrictions and limitations (e.g. taking a position break after sitting up to 30 minutes, changing positions after standing or walking up to 30 minutes, limiting fingering/typing to occasional), Plaintiff could work full-time consistently.

62.    Dr. Vlachos based her limitations not just on the exam and records review, but also "[took] into account [Plaintiff's] perceived limitations." (312.) Simple modifications like an ergonomic workstation, a sit-stand desk, and voice-activated software would permit Plaintiff to perform occupational duties within those restrictions. (311-12.)

63.    Dr. Vlachos noted that these restrictions and limitations were "very similar" to those imposed by Plaintiff's own Dr. Haronian and the QME physician, Dr. Arora. Indeed, Dr. Tun had recommended an ergonomic workstation, apparently even before Plaintiff left work. (1119 (on 5/14/18 noting that Plaintiff was "still working on an ergonomic work station").)

64.    Even Mr. Jurado had concluded Plaintiff could sit for up to 3 hours per day, stand for up to 3 hours per day and walk up to 3 hours per day, which constituted 8 hours in a day. (313, 708.)

65. Dr. Vlachos certified that she does "not accept compensation for review activities that is dependent in any way on the specific outcome of the case." (313.)

66. Ms. Murray sent Dr. Vlachos's IME report to Plaintiff's counsel to for review and comments. (257.)

67. Counsel did not comment, but instead submitted additional information, including additional records and reports by Drs. Haronian and Kohan. Though the reports contain a lengthy recitation of records Plaintiff never provided to Lincoln, neither Dr. Haronian nor Dr. Kohan addressed the IME or changed the restrictions/limitations they had previously provided. (78-220.) Plaintiff also provided advocacy statements from herself and her friend/personal trainer describing how they felt Plaintiff's functionality had declined over time. (61-75.)

68. Finally, counsel included an advocacy letter from Mr. Jurado dated February 21, 2020 reiterating his opinion that Plaintiff did not have full-time work capacity (despite him having given her over 8 hours of functionality per day), because on day 1 of the exam, Plaintiff sat for up to 30 minutes until deciding that she had to stand up due to pain, but only sat for 15 minutes before standing up, on day 2. (62-63.)

69. Mr. Jurado did not address the fact that Dr. Vlachos observed Plaintiff sitting during her examination for 45 minutes without signs of pain. (*Id*.) Mr. Jurado argued that the FCE results demonstrated Plaintiff would have greater difficulty on days 3 and 4 of work "based on objective findings" – in reality, Plaintiff's self-reported capacity to sit, stand, reach, etc. (63)

70. Counsel also provided letters dated 2017 from several providers recommending that Plaintiff use ergonomically approved furniture and/or a standing desk. (238-40.)

71. Ms. Murray reviewed the above information and wrote to Plaintiff's counsel on April 16, 2020 upholding the denial of Plaintiff's claim on appeal because Plaintiff failed to provide written proof that she was disabled for the entire

elimination period (from May 15to November 15, 2018), as required by the Group Policy. (12) Plaintiff filed this action on May 1, 2020.

## CONCLUSIONS OF LAW

1.      Any conclusion under this category that is a finding of fact is also hereby adopted as a finding of fact.

2.      Because the Plan at issue in this lawsuit is an employee welfare benefit plan, the relationship between Lincoln and Collier is governed by ERISA.

3.      The Court reviews Plaintiff's claim under a *de novo* standard of judicial review.  Under a *de novo* standard, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  In doing so, the court determines whether the plaintiff is entitled to benefits based on the evidence in the administrative record.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090-1091 (9th Cir. 1999).

4.      The plan terms are the "linchpin" of ERISA. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013). "The plan . . . is at the center of ERISA . . . [T]he administrator's duty is to see that the plan is maintained pursuant to [that] written instrument." *Id.* (internal quotations omitted). Under ERISA, then, Lincoln has a duty to strictly enforce the plan's proof requirements and to pay benefits only to those who provide adequate proof of disability. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, at 148 (1985). This fiduciary mandate, derived from trust law, "does not necessarily favor payment over nonpayment. The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries." *Varity Corp.*, 516 U.S. at 514; *see also Conkright v. Frommert*, 130 S. Ct. 1640, 1650 (2010) (administrators "have a duty to all beneficiaries to preserve limited plan assets . . . [and should] prevent . . . windfalls for particular employees").

5.      Plaintiff bears the burden of proving entitlement to benefits under the Plan. *See Muniz v. Amec Const. Mgmt., Inc*., 623 F.3d 1290, 1294 (9th Cir. 2010).

6.      The fact that Plaintiff received medical diagnoses does not establish that she was disabled as defined by an ERISA plan.  *Jordan v. Northrop Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability.  Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working.  …Sometimes [peoples'] medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions."); *Hegger v. Unum Life Ins. Co. of America*, 2013 U.S. Dist. LEXIS 28587, *32 (N.D. Cal. 2013) ("The evidence establishes that plaintiff suffers from legitimate medical conditions and that these conditions cause her some level of pain. She is not, however, disabled."); *Kunstenaar v. Connecticut General Life Ins. Co*., 902 F.2d 181, 183 (2d Cir. 1990) ("*Plaintiff confuses illness with total disability*.  No one is disputing the fact that Kunstenaar was ill.  In fact, he may have been ill since June of 1985.  However, illness is not to be equated with total disability."  (Emphasis added.).

7.      There were very good reasons not to simply accept Plaintiff's self-reported limitations.  *See Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009) aff'd, 409 F. App'x 99 (9th Cir. 2010) ("numerous Courts have concluded that an administrator" may require "objective evidence of an inability to function in the workplace"); *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1191 (C.D. Cal. 2008) ("Plaintiff claims that his subjective complaints should be accepted at face value. The rule is to the contrary."). The contemporaneous medical records Lincoln gathered did not provide any support for impairment from Plaintiff's sedentary to light occupation. Instead, they showed very limited treatment for orthopedic complaints during the May 15 to November 15, 2018 elimination period and that treatment was aimed primarily at establishing a

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

work-related injury. The contemporaneous medical records, show that Drs. Tun and Dr. Haronian both opined that she had full-time work capacity with some slight and reasonable modifications, which is consistent with Dr. Vlachos's IME opinion. In addition, an unbiased and independent expert, Dr. Arora, examined Plaintiff in connection with her workers' compensation claim and noted inconsistencies between Plaintiff's self-reported complaints and the information in her medical records, as did peer reviewer Dr. Chhatre. Dr. Arora, like Drs. Tun, Haronian, and Chhatre, determined Plaintiff could work.

8.      Lincoln appropriately weighed the opinions of Drs. Chhatre and Vlachos more heavily than the FCE by Mr. Jurado. The FCE relied almost exclusively on Plaintiff's subjective efforts and her self-reported limitations about what she felt she could or could not do during the FCE. (*See, e.g.*, 709-11.) Such a "test", at most, can establish minimum abilities, not maximum ones. *See Langlois v. Metro. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 72779, 2012 WL 1910020, at *14 (N.D. Cal. May 24, 2012) (referring to the "inherently less reliable" nature of subjective reports); *Gorbacheva v. Abbott Labs. Ext. Disability Plan*, 309 F. Supp. 3d 756, 771 (N.D. Cal. 2018), aff'd, 794 F. App'x 590 (9th Cir. 2019) (affirming administrator's decision to give FCE little weight on the basis that validity testing was insufficient to determine whether plaintiff was putting forth full effort).

9.      Dr. Vlachos's opinions were entitled to considerable weight because they were directly in line with the opinions of Plaintiff's own physicians, Drs. Tun and Haronian, who concluded that she could return to work with common-sense restrictions. *See, e.g.*, *Bradley v. Summit Inst. for Pulmonary Med. & Rehab.*, 2005 WL 2219284, at *6 (W.D. La. Sept. 13, 2005) (upholding claim denial based in part on medical recommendation that plaintiff be provided with a special chair and voice-activated computer); *Hines v. First Unum Life Ins. Co.*, 2016 WL 1246483, at *12 (S.D.N.Y. Mar. 23, 2016) (denial upheld where three doctors opined claimant could do his job with ergonomic modifications); *Walsh v. Long Term Disability Coverage*

*for All Employees Located in the United States of DeVry, Inc.*, 601 F. Supp. 2d 1035, 1038 (N.D. Ill. 2009) (denial upheld because peer reviewer determined claimant could perform her occupation "with relatively minimal accommodations" such as an "ergonomic chair, and perhaps a sit-stand workstation").

10.    Plaintiff's subjective, advocacy statements from Plaintiff herself, as well as her friends and family are entitled to little weight. *See, e.g., Childers v. United of Omaha Life Ins. Co.*, 2013 WL 683498 at *27 (S.D. W. Va. Feb. 22, 2013) (noting that letters of support attesting to a claimant's "good character" or describing "the author's observation of the deterioration of the [claimant's] condition" do not provide "the type of evidence required by [ERISA plans] to satisfy proof of loss"); *Withey v. Metropolitan Life Ins. Co.*, 1994 WL 731584 at *4 (D. Colo. Mar. 7, 1994) (to rely on "self-serving, uncorroborated testimonials of [claimant] and her several friends" would be "beyond the bounds of reasonable judgment"). Beyond the inherent problems with proving disability through the non-medical opinions of lay-people, the statements are inconsistent with the medical records and Plaintiff's own statements concerning her functionality and activity levels.

11.    Plaintiff failed to prove by a preponderance of the evidence that she was "disabled" as defined by the Plan throughout the Elimination Period.

12.    Plaintiff is not entitled to LTD benefits under the Plan.

13.    Judgment shall be entered in Lincoln's favor consistent herewith.

DATED:  March 18, 2021                OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


                                      By: /s/ Jenny H. Wang
                                          Jenny H. Wang
                                          Kristina N. Holmstrom (pro hac vice)
                                          Attorneys for Defendant
                                          LINCOLN LIFE ASSURANCE
                                          COMPANY OF BOSTON

46426374.1

19                                    Case No. 8:20-cv-00839-JVS-KES

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW