1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

VICKI COLLIER,                    )CERTIFIED TRANSCRIPT
                       Plaintiff, )
        vs.                       )
                                  )  SACV-20-00839-JVS
LINCOLN LIFE ASSURANCE            )
**COMPANY OF BOSTON,**            **)**
                       Defendant. )
-----------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

April 12, 2021

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

APPEARANCES OF COUNSEL:

For the Plaintiff:

GLENN R. KANTOR
**KANTOR & KANTOR, LLP**
**19839 Nordhoff Street**
**Northridge, CA  91324**
**(818) 886-2525**

For the Defendant:

KRISTINA N. HOLMSTROM
**OGLETREE, DEAKINS, NASH, SMOAK, & STEWART, PC**
**2415 East Camelback Road, Suite 800**
**Phoenix, AZ  85016**
**(602) 778-3700**

SANTA ANA, CALIFORNIA; MONDAY, APRIL 12, 2021; 1:31 P.M.

THE CLERK:  Calling Item 2, SACV-20-00839-JVS, Vicki Collier versus Lincoln Life Assurance Company of Boston.

THE CLERK:  Appearance on behalf of the plaintiff, please.

MR. KANTOR:  Good afternoon, Your Honor.  Glenn Kantor for the plaintiff.

THE COURT:  Good afternoon.

THE CLERK:  On behalf of the defense, please.

MS. HOLMSTROM:  Good afternoon, Your Honor.  Kristina Holmstrom on behalf of the defendant Lincoln.

THE COURT:  Good morning.

Mr. Kantor, your e-mail to my clerk yesterday was an improper mode to communicate with the Court.  It really amounted to a surreply, and it was uninvited and inappropriate.

MR. KANTOR:  I apologize, Your Honor.  I did not know what to do.  I did not mean it as a surreply.  I just meant it to be assistance to the Court.  And I said in there I wasn't sure if it was proper because it was a Sunday.  I didn't know what to do.  So I apologize.

THE COURT:  Mr. Kantor, let's begin with you.  You've got about 20 minutes.

MR. KANTOR:  Okay, Your Honor.

As I think we all know, this is only an issue as to -- what's at issue right now is the plaintiff's own occupation benefits. She's entitled to benefits if she can't do the material duties of her own occupation, and as I'll discuss in a minute or two that they can't be reasonably modified or omitted.

In the record at Liberty 77, it provides that her job is 85 percent use of a video display terminal doing -- I'm going to assume that we can all agree, and if I'm wrong somebody will let me know that using a video display terminal means using a computer. Using a computer means fingering constantly. Doing the simple math, if 85 percent of an eight-hour workday is using a computer, that's 6.8 hours a day.

So our position is quite simply that with her limitations she can't do those job duties. Now, in the case of Robertson v. Standard Insurance Company at 139 F.Supp.3d 1190, the Court refers to the Social Security -- the Social Security Administration says that use of the word "occasionally" means not more than two hours of an eight-hour workday. So, once again, I would argue that if Ms. Collier can only occasionally finger or do her computer work, then she certainly can't do her own job duties.

Now, her own doctors made it very clear they believe she could not do her own job duties without a

combination or modification.  But more importantly, I think is that the IME retained by Lincoln after an examination and a review of the records stated -- and I'm going to quote Liberty's file at page 38, which is Dr. Vlachos's report: "The claimant may perform tasks with regard to fingering, feeling, gripping, and grasping, on an occasional basis." So she's saying she can only do it occasionally.  So right there I would say "occasionally" means less than two hours a day.

She goes on to say she may benefit from voice-activated software should she require any computer work.  Well, clearly, as I've argued, her job does require computer work.  Now, Dr. Vlachos says she may benefit from voice-activated software.  I would assume that if something like a voice-activated software were a job modification or accommodation that could be provided, then arguably potentially she's not disabled.

However, in her response to Vlachos's report, Ms. Collier emphatically advised Liberty -- and this is at page 0067 of Liberty's file.  She said that she talked to her supervisors -- and I am paraphrasing, but it's at page 67 at paragraph 12 of her statement -- that she talked to her supervisors after talking to her doctors who told her no typing, no use of both shoulders and arms, and that her supervisors read the letter -- and I'm not going to quote --

and said they would be back to her shortly.  Thereafter, they called her into the office and said they had spoken with HR and were unable to accommodate the restrictions.

Now, at that point, I believe that's the ballgame as far as this case.  This is an own occupation issue.  Her job duties require her to do 85 percent fingering, computer work.  Her doctors say she can't do it, and the IME that is retained by Lincoln says she can only do it two hours a day -- and I'm using -- I'm extrapolating a maximum of two hours a day from the word "occasionally," which is what Social Security says "occasionally" means in a workday, up to two hours of an eight-hour workday.  So if we stop there, I don't understand how the Court doesn't say, well, from the own occupation standpoint, she's disabled.

Now, there was a reference in a comment in the Court's tentative that the only thing in the record that supports that her employer would not accommodate her inability to do the typing was her own statement.  I'm trying to read between the lines of what the Court said.  It sounded like the Court was saying that might not be good enough for the Court.  The Court may have wanted the employer to have said that.

Now, I'm not really sure what to do about my inappropriate surreply other than just to go through it again, which is that the Ninth Circuit said in Harlick,

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

which is quoted -- I've sent it to Ms. Holmstrom.  I assume she got it -- that you can't bring in a new defense for first-time litigation.

So Ms. Collier, as part of her administrative appeal, says to Lincoln my employer will not accommodate me.  They can't modify or omit my 85 percent typing all day.  Lincoln does not say to her, well, you telling us that isn't good enough.  We need a letter from your employer.  If they had said that, she could have undertaken to have gotten the letter.  But Lincoln doesn't say it to her or to us where at this point we are handling her appeal.  So we say, okay, Lincoln is accepting that the typing can't be modified.

Now, this is a de novo case.  The Court is saying, well, it might have been good enough for Lincoln.  I don't know if it's good enough for me.  I'm sorry if I'm putting words into the Court's mouth, but I'm just trying to understand what the Court was saying.

I think the Court acting equitably has two options.  One is to say Lincoln didn't raise it.  This is the only thing in the record, so I will accept it as fact that the employer wouldn't modify it.  Alternatively, if the Court felt that more information was required in the decision in Jebian, which I can quote -- if you give me a minute, I'll find the cite, which is 349 F.3d 1098.  The Court made very clear in a de novo situation if the trial

Court feels additional information is required, it can require the parties to provide it.

So I suppose an option if the Court really believes that the employer did not decline to modify her 85 percent a day job requirement of typing, then it could stay this while we go out and get either a deposition or declaration from the employer.

Given that in the logical real world if somebody's job duty is 85 percent typing, it's unlikely that the employer is going to say we'll find something else for you to do that won't require that.  I would expect that both your court reporter and your courtroom clerk are spending a huge portion of their time typing.  If they were to say, well, I can't do the typing, could the Court accommodate them?  I don't think so.  I think the same thing is going to happen --

THE COURT:  Let me ask you about Dr. Vlachos.  Does his observation that she can only occasionally do fingering, feeling, gripping, et cetera -- is that based on his observation of the objective tests that he put her through, or is it based on what she reported to him?

MR. KANTOR:  Well, first, Dr. Vlachos is a she.

THE COURT:  Was it based on objective testing or what she reported to him?

MR. KANTOR:  Well, we don't know.  All we know --

THE COURT:  Is there any evidence in the record that observation was based on objective testing?

MR. KANTOR:  No.

THE COURT:  Okay.

MR. KANTOR:  What she did is, according to my client -- and there's nothing in the record to dispute it -- Dr. Vlachos reviewed the other doctors' reports.  She talked to my client for 40 minutes and then had her do a little bit of walking, and she agreed that her limitation for typing was up to -- was occasional, which I have interpolated -- have said is two hours a day.

Now, if the Court wants to say Lincoln's IME didn't know what she was talking about -- I'm going to disregard their own IME -- and the findings of her own doctors were based at least in part on her subjective reporting, well, I wouldn't know what to say about that.

THE COURT:  Did any of the treating or attending physicians on either side of the equation actually -- do an objective test as to whether she could type for more than two hours, or is this all based on her report?

MR. KANTOR:  There was nothing done on the defense side in the way of any objective testing.  All they did was look at records and talk to her.  On the plaintiff's side -- well, first of all, if we go back, there was objective testing to the extent that she had such severe problems she

had to have surgery on her shoulder.  She had the surgery. She came back to work.  She was in so much pain she had to go back out.  Now, I don't know that there was any objective testing by her physicians.

Now, the FCE provider, Dr. Jurado, did do objective testing.  He did grip testing.  Now, the Court cited to a case that said it's unclear whether any of the testing by an FCE provider can be manipulated, and the case cited by the Court says it's unclear.  That's a question for a jury.  We really don't have evidence on that.  I would point out that the decision the Court cites is from 18 years ago.  And given all of the advancements in medicine and computerized science, I have to believe that the testing utilized by the FCE provider is more precise and that they measure blood pressure.  They measure heart rate.  When somebody's in pain, they can measure that.

So the answer to your precise question about the limitation on fingering, yes, the FCE provider did objective testing and determined she could not perform her job duties.

Now, the only other point that I think I would really like to focus on is the Court's questioning of her credibility.  The Court went out of its way to point out that in some ways the Court found her credible, that she had a good work ethic, that she had gone off on surgery, come back and tried, which is indicative of a strong work ethic.

But then the Court says, well, but I don't know if that credibility is offset by the fact -- oh, also the Court talked about should we take a third decrease in her compensation, but said that this necessarily doesn't mean that she doesn't have a reason, a secondary gain I suppose, to not work.

But everything supports she is credible.  First, she underwent surgery.  I don't think people typically do that for the fun of it.  As we've said, she enjoyed her job.  When she did try and go back, she couldn't continue to work.  Her doctor said you may need more surgery, but she didn't have medical coverage to provide for it.  She asked her employer if they could accommodate her, and the answer was no.

The Court focused on the fact that it didn't look like from her medical records, for example, the MRIs, that they were significantly worse from like 2016 to 2018.  But the case law is clear.  That is not indicative that somebody is malingering or not disabled.  All it means is potentially they were the classic heroic plaintiff, that she kept working as long as she could until she was in too much pain to stop.

The other point the Court focused on was she said that she continued to try and exercise.  Well, after her surgery, she was given physical therapy, and she continued

to do that on her own.  That's part of what she would categorize as exercise.  But the record is not really clear on what exercise we're talking about.  Her living partner talks about the decrease in the type of exercises she did.  Where she used to exercise strenuously, now she's going to a gym and stretching.

Her doctors want her to be active.  To suggest that because she is continuing to try and exercise means that she could -- once again, I think this is just so critical -- do her own occupation typing 85 percent of the day just does not correlate.

Unless the Court has questions for me, I would turn my time over to Ms. Holmstrom.

THE COURT:  Very good.  Thank you.

Ms. Holmstrom.

MS. HOLMSTROM:  Thank you, Your Honor.

I will begin by addressing this issue of typing. Counsel cited to a document in the record that said she had to use a computer -- or a video terminal 85 percent of the time, but that wasn't from the analysis of the plaintiff's occupation.  That was from a job description from her specific employer which is dated July of 2005.

Under the terms of the policy, that's not the relevant inquiry.  The occupational analysis that Lincoln did -- and that hasn't been challenged with any evidence of

13

occupational duties beyond for her specific employer.  That occupational analysis found that she had to finger or type frequently, and that is defined as one-third to two-thirds of the day.  That is 1156 of the administrative record.  The FCE provider, Mr. Jurado, agrees that "frequently" means one-third to two-thirds of the day.  So the occupational analysis shows that the plaintiff only had to use her fingers to type or finger on a computer terminal for one-third to two-thirds of the day.

Dr. Vlachos, who gave significant weight to the plaintiff's pain complaints, determined she could occasionally finger, which leaves a discrepancy of maybe a couple hours per day.  Dr. Vlachos opined and Lincoln agreed that that gap could be filled with adaptive technology. voice-activated software.  I mean, the record is full of indications that her physicians agree that ergonomic adaptations to her work station would allow her to function better.  So it's really completely supported by the evidence that plaintiff did not establish that she could not perform a duty that could not be reasonably modified.

As to plaintiff's own uncorroborated statement in her declaration that she asked for accommodations and her specific employer declined them, again, her specific employer's willingness to accommodate any restrictions is not dispositive because the policy looks to what her general

occupational duties are.  And this was fully explained in the appeal letter.

The specific duties for her employer may be lighter or heavier than her occupational duties as a whole, which if we are to believe her arguments here, it is the case with her job.  But that does not make her disabled from her occupation, which only requires frequent fingering and keying.

The other point I wanted to make about that request for accommodations is even according to the plaintiff's own declaration she made that request in May of 2018 at the very beginning of her elimination period.  The request was based on restrictions and limitations provided by Dr. Tun, which said no typing at all.  Those restrictions and limitations expired before the elimination period expired.  So those restrictions and limitations, even if they were supported at the time by the record, which we contend they were not, would not have any bearing on whether the plaintiff satisfied her full elimination period.

The only restrictions and limitations that we have from the elimination period come from Dr. Haronian.  While he does talk about minimizing repetitive hand use, that is very consistent with what Dr. Vlachos said, saying she can do this occasionally and can get an assist from voice-activated software.

15

On page 24 of our opening brief, we did cite to cases where courts have repeatedly held that these routine accommodations that technology has sort of made commonplace, like with activated software and ergonomic work stations, are reasonable accommodations.  So without evidence that her specific occupation was not susceptible to those accommodations for some reason, the defendant has failed to meet her burden of proof.

Those accommodations were specifically mentioned in Dr. Vlachos's IME report which was sent to the plaintiff -- well, to counsel -- before her appeal was decided.  So if plaintiff did believe that she had evidence showing that her occupation could not be reasonably modified to account for Dr. Vlachos's keying restrictions, she could have submitted it.  She did not.  She had every opportunity to.

I want to touch briefly on Harlick.  Harlick was an abuse of discretion case which, as the Court is aware, was decided under a completely different standard.  In an abuse of discretion case, it's very difficult to say you, claim administrator, did not abuse your discretion by making a claim decision but not articulating that same claim decision in the record.  You know, in an abuse of discretion case, you can't change the reasons.

In a de novo case, the administrator's explanation for its claim decision is frankly irrelevant because the

Court has an independent duty to thoroughly review the record as the Court has done here and make its own assessment of the evidence, and also to make the Court's own credibility decisions and weigh the evidence accordingly. It gives no deference to what Lincoln put into its claim correspondence.  It is not limited thereby.

But, in any event, Lincoln's position has always been that the plaintiff did not produce enough evidence to show that she was disabled from her own occupation as those terms are defined in the policy.  That reason has remained consistent.

The explanation about her having no evidence that her employer would not have accommodated these restrictions, it's just another detail elaborating on that reason.  It's not a new reason independently.  A new reason would be something like, in the claim, Lincoln denied her claim because she failed to prove disability.  But during litigation we say, no, it's actually subject to the preexisting condition exclusion.  It would be completely switching the reasons for denial.  That's what the cases are concerned about that Harlick is discussing.

In fact, Harlick -- it was a medical benefits case.  The administrator had decided that this particular type of residential care was not covered by the policy and then during litigation attempted to interject another

reason.  In any event, the residential care was not medically necessary.

Medical necessity and coverage are two completely different reasons, and it was under that framework using the abuse of discretion standard that the Ninth Circuit really said, no, you can't do this.  You can't come up with a whole new reason that was never analyzed during the claim.  We're not going to let you do that.  Again, it was not a de novo case where the Court had the freedom and the obligation to independently review everything in the record.  The Court certainly has that freedom here.

As I mentioned earlier, whether or not plaintiff's specific employer would have accommodated those restrictions at the very outset of her claim doesn't really govern the Court's analysis here.  The point is the records show that the plaintiff did retain significant functionality, including the ability to finger and key occasionally, and she could perform her occupational duties within that scope of functionality, assuming that she had some pretty widely available adaptive software available to her.  That was the reason for Lincoln's decision.  It's consistent with what the Court put in the tentative order, and I don't really have much to add to the Court's reasoning in that order.

So unless the Court has questions, I'm all done.

THE COURT:  No.  Thank you.

Mr. Kantor.

MR. KANTOR:  Well, yes, Your Honor.  First, the dichotomy between own job and own occupation is ridiculous. What Lincoln is saying is, all right, we almost can see because your employer has said they won't accommodate you -- they won't give you these supposedly routine accommodations of something like Dragon Speak -- go out and find a new job. Find something else that maybe you could do.  And by the way, when you sit down for the job interview, tell the employer, by the way, I can't do the job the way it's normally done.  I need you to be able to accommodate me through special means.

There's got to be -- you know, a risk is an equitable statute -- some equity here about the reasonable likelihood that an employer is going to employ somebody in a market where they are told from the outset I can't do the job the way it's done.  You're going to have to make a special accommodation for me.  To say it's ludicrous is an understatement.

THE COURT:  Well, is it your position that the ability of effective accommodation to allow her to do her work still renders her disabled or unable to do her work?

MR. KANTOR:  I'm sorry.  Could you repeat the question?

THE COURT:  Sure.  The record seems to indicate

that there is adaptive software that would enable her to do her job.  Is the fact that she couldn't do the job before of any significance if she could do the job with adaptive software or other accommodations?

MR. KANTOR:  Her job was mostly data entry.

THE COURT:  No, no, no.  Here is my theoretical question.  Assume she can't do the job in the same way, but she can do the job with adaptive software or other accommodations.  Under those circumstances, is she entitled to a finding that she can't do her job just because she can't do it in the same way she used to?

MR. KANTOR:  No.  I would agree with the Court if those accommodations are reasonable.  Let me offer an example.  She works in a two-story building.  Her office is on the second floor.  She has a very bad hip, and she just cannot manage the stairs to get from the first floor to the second, and there is first floor offices available.  Is it a reasonable accommodation to say, all right, we'll move you to the first floor?  Of course it is.

Now, her job was mostly data entry for applicants for insurance.  Ms. Holmstrom had said there is easily and readily available, widely available, software to allow her to do her job with accommodation.  My response would be where in the record is that information that it's easily and widely available that somebody can give that to her to allow

20

her to do her job?

My response is she went to her employer.  They told her no.  If she's a valuable employee doing a great job and there was such easily and widely available accommodations, they would have provided them.

Maybe we need an evidentiary hearing on that one issue.  Were there accommodations available, and were they reasonable or not?  So what this comes to is what Lincoln is saying, if your employer will accommodate you, we don't have to pay the benefits.  We have decided that your employer needs to go out of its way to find a way to accommodate you so that you can do your occupation, which requires 85 percent of the day to be in front of a computer.

THE COURT:  You've got a minute to respond to that if you'd like to, Ms. Holmstrom.

MS. HOLMSTROM:  Yes, I have a few responses.  First of all, the occupational analysis simply isn't consistent with her job being 85 percent sitting at the computer and entering data.  She was an insurance salesperson.  The record is full of -- and the parties both mentioned it in the briefs -- you know, high praise for her ability to work with clients and find appropriate coverage.  She was one of the top producing sales agents in her office for many years.  That is not just a data entry clerk.  It's not the same thing.  And our occupational analysis does

account for that.

As far as the software and ergonomic work stations being available, in general, we put that in the letter.  I mean, we put that in the IME report.  It was in the IME report that we sent to plaintiff's counsel.  If there was really some issue that this available technology was for some reason unavailable to the plaintiff, she had the ability to produce evidence on that point.  She did not.

The burden of proof here falls with the plaintiff.  She has to prove that she meets the definition of "disability," which means she needs to prove that there are substantial and material duties to her occupation -- again, not her job but her occupation -- and they cannot be reasonably accommodated.  There is no such evidence in the claim file in the administrative record.

In fact, as I noted previously, the job description where we get that 85 percent in front of the computer terminal is dated in July 2005.  That's 13 years before she went out on claims disability.  So that's absolutely not probative of the material and substantial duties of her own occupation as of May 2018.  Nor is it probative that her specific employer could not or would not accommodate the restrictions of no typing at all, which was what Dr. Tun initially said.

Again, that restriction did not last through the

elimination period, so that cannot be used to grant her benefits.  The restrictions and limitations after that were from Dr. Haronian and Dr. Vlachos saying that she does retain some of that functionality but might need a little bit of help.

The other point I did want to make is that while it may be more challenging for a job applicant who needs accommodations to find employment, this is not unemployment insurance.  The ability to find an employer who will accommodate you is not dispositive.  If she can do the job with accommodations that are reasonable, she's not entitled to benefits.

That's all I have, Your Honor.

THE COURT:  Mr. Kantor, you get the last word.

MR. KANTOR:  Well, Your Honor, there are a lot of last words I would like to add.  First of all, the job description is the only thing in the record that specifically says her job requires 85 percent a day typing. While Ms. Holmstrom is correct that it's an older job description, in our world, the use of computers has increased, not decreased.

I think the Court has got the gist of what we are arguing.  The last thing I will say as a disability attorney is it's highly offensive when Ms. Holmstrom says we're not an unemployment agency.  We don't have to provide you

benefits just because you can't do your job and no other employer is willing to hire you.  That's not our problem.  That's yours.  Back in the real world, employers don't look to hire people who need accommodations.  Well, that's not part of our coverage.  That's your problem.

You know, the reasonable expectation of the insured is that if they can't do their job and it can't be reasonably accommodated, then they get benefits for 12 months.  That's all we are talking about here is 12 months of benefits and a remand to see if there are other occupations that she could do given her education and experience.

You know, she's proven through her efforts at surgery, therapy, shots, that she is doing everything she can.  I'm sorry if I'm on a soapbox, but Lincoln is just trying to find a way to avoid paying her what she paid premiums for, which is coverage if she could not perform her own occupation.  Those are my last words.

THE COURT:  Well, thank you very much for the argument this afternoon.  It's been quite helpful.  We'll get a ruling out promptly.

MR. KANTOR:  Thank you, Your Honor.  Nice seeing you.

THE COURT:  Anything further for today?

MR. KANTOR:  No, Your Honor.

          MS. HOLMSTROM:  No, Your Honor.

          THE COURT:  Okay, thank you.

          MS. HOLMSTROM:  Thank you.

     (Whereupon, the proceedings are concluded.)

                    *    *    *

25

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  May 18, 2021

/s/   Sharon A. Seffens  5/18/21
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER